STATE, Respondent, v. PRATT, Appellant.

*September 11—October 3, 1967.*

[2] *State v. Carlson* (1958), 5 Wis. 2d 595, 604, 93 N. W. 2d 354.

314

For the appellant there was a brief by *Morrissy, Morrissy, Sweet & Stowe* of Elkhorn, and oral argument by *Lowell E. Sweet.*

For the respondent the cause was argued by *Betty R. Brown,* assistant attorney general, with whom on the brief were *Bronson C. La Follette,* attorney general, and *William A. Platz,* assistant attorney general.

BEILFUSS, J.   The defendant's contentions raised three issues:

1. That his wife's testimony should not have been admitted since it involved privileged communications.

2. That the testimony of Deputies Lentz, Galley and Polansky should not have been admitted on the basis of *Miranda v. Arizona* (1966), 384 U. S. 436, 86 Sup. Ct. 1602, 16 L. Ed. 2d 694, because defendant was not advised of his rights before he made admissions to them.

3. That the eighteen month indeterminate sentence constitutes cruel and unusual punishment in violation of the eighth amendment of the Constitution of the United States and of art. I, sec. 6 of the Wisconsin Constitution.

The defendant contends that the girl, being his wife, may not testify against him concerning acts and communications occurring prior to marriage.

The Wisconsin statute is clear on the subject:

"885.18 **Husband and wife.** A husband or wife shall be a competent witness for or against the other in all cases, except that neither one without the consent of the other, during marriage, nor afterwards, shall be permitted to disclose a private communication, *made during marriage*, by one to the other, when such private communication is privileged. Such private communication shall be privileged in all except the following cases:

"(1) Where both husband and wife were parties to the action;

"(2) Where such private communication relates to a charge of personal violence by one upon the other;

"(3) Where one has acted as the agent of the other and such private communication relates to matters within the scope of such agency;

"(4) Where such private communication relates to a charge of pandering or prostitution." (Emphasis supplied.)

The defendant urgently argues that it is contrary to public policy to interpret the statute so as to confine the privilege to communications made during marriage. In construing or "interpreting" a statute the court is not at liberty to disregard the plain, clear words of the statute. The legislature by its act has determined the public policy of this state to be that the marital privilege

of not testifying shall be confined to communications made during marriage and further limited this privilege by specified exceptions.

The public policy urged by the defendant may well have supported the early common-law rule of incompetency of a spouse to testify, but it does not support the modern day rule of privileged communications such as the legislature of this state has adopted.

The earlier common-law rule of incompetency was actually a combination of two distinct rules: (1) The rule that the spouse of a party or person interested is disqualified from testifying for the other spouse, and (2) the rule of privilege of a party against having the party's spouse testify as an adverse witness. These two rules operated to prevent the spouse from testifying at all.

Apparently the policies supporting the incompetency rules were, respectively: (1) That the spouse's testimony was tainted with his or her interest and therefore of no value, and (2) that the spouse testifying adversely would threaten the marriage relation itself.

Unlike incompetency, the privilege for marital communications, which was nonexistent in early common law, is limited to a certain class of testimony; communications between the spouses; or in some states, information gained because of the marital relation.

The policy supporting the privilege is to encourage marital confidences.

While some early legal scholars conceived and articulated the policies supporting the privilege for marital communications, judicial recognition was virtually nonexistent until 1853 since the wider disqualification of incompetency left little opportunity for the question of the existence of such a privilege to be considered.

However, the English Evidence Amendment Act of 1853 abolished the incompetency of spouses and enacted that "no husband shall be compellable to disclose any communication made to him by his wife during the marriage, and no wife shall be compellable to disclose any communication made to her by her husband during the marriage." [1]

Nearly all states in this country, in their statutes making spouses competent to testify, have included provisions disabling them from testifying to some types of communications between them. With the enactment of such statutes, the doctrine of privileged marital communications supplanted the doctrine of incompetency of the spouse.

Some states enacted a much broader privilege than did the 1853 English Act. However, the Wisconsin statute is almost identical to the English Act. It specifically abolishes the incompetency rule and then provides for the limited privilege for marital communications *made during marriage*. The Wisconsin statute clearly subscribes to the more limited policy supporting the marital privilege only and not the broader policy supporting incompetency.

The defendant cites the case of *State v. Volpe* (1931), 113 Conn. 288, 155 Atl. 223, as involving a similar state of facts where the Connecticut Supreme Court ruled that the wife could refuse to testify against her husband concerning an act occurring prior to marriage. However, the Connecticut statute involved in that case is different from ours. That statute, like Wisconsin's sec. 885.18, abolishes the incompetency of the spouse, however unlike Wisconsin's enacts a much broader privilege which

[1] See McCormick, *Evidence* (hornbook series), pp. 168–180, secs. 82–90 for a discussion of the historical background and public policy factors involved in common law doctrine of spousal incompetency and statutory marital privilege.

in effect gives the spouse an option to render himself or herself incompetent.[2]

The defendant also cites for the court's consideration *San Fratello v. United States* (5th Cir. 1965), 340 Fed. 2d 560, 566, where it was said:

"The fact that the defendant marries the witness after the commission of the offense and a short time before the trial does not make an exception to the rule, even though it is for the possible purpose of preventing her from testifying."

The "rule" the court was speaking of was:

"The common law rule . . . that the *mere fact of calling one spouse* as a witness for the prosecution in a criminal trial of the other for the purpose of forcing the claim of marital privilege against testifying is prejudicial error." *San Fratello, supra,* page 566.

The court in *San Fratello* in no way holds that the marital privilege will apply to communications made prior to marriage in the face of a statute to the contrary. In fact, *San Fratello* did not involve the marital privilege. The problem in the case was whether the spouse (an alleged accomplice) could be called to the stand merely for the purpose of forcing her to claim her privilege against self-incrimination. The marital privilege was referred to in the opinion merely to draw upon the rules developing in states where the broader marital privilege had been enacted.

The contention that the sheriff's deputies' testimony concerning statements made by defendant should not have been admitted cannot be sustained.

[2] Connecticut General Statute, 1930, sec. 6480: " 'Any person on trial for crime shall be a competent witness, and at his or her option may testify or refuse to testify upon such trial; and, if such person shall have a husband or wife, he or she shall be a competent witness but may elect or refuse to testify for or against the accused, . . .' " *State v. Volpe, supra,* pages 290, 291.

The incriminating statements made by the defendant were made on two different occasions: First, in the conversation with Deputies Lentz and Galley at the Twin Lakes village hall it appears the defendant said he married the girl because he had her pregnant. Second, the following day when defendant saw Deputy Polansky he again made the statement that he married the girl because he had her pregnant. On neither occasion was defendant informed or advised of his constitutional rights. The defendant therefore contends that the deputies' testimony was inadmissible by virtue of the United States Supreme Court's decision in *Miranda v. Arizona, supra.*

In *Johnson v. New Jersey* (1966), 384 U. S. 719, 86 Sup. Ct. 1772, 16 L. Ed. 2d 882, the court announced that *Miranda* applies only to cases in which the trial began after the date of the *Miranda* decision, June 13, 1966. The decisions of this court are thoroughly in accord with *Johnson.*[3] In only May of this year, in *Greenwald v. State, supra,* page 153, this court stated:

"The procedural safeguards set forth in *Miranda* are not applicable since the trial in this case began before the date of that decision."

In the case at bar the trial began on May 24, 1966, twenty-one days prior to the United States Supreme Court decision in *Miranda.*

Defendant's remaining contention is that a sentence of eighteen months constitutes cruel and unusual punishment, under the circumstances here presented, in violation of the eighth amendment to the United States Constitution and of art. I, sec. 6 of the Wisconsin Constitution.

Under the eighth amendment to the United States Constitution the federal appellate courts have taken the position that:

---

[3] *Greenwald v. State* (1967), 35 Wis. 2d 146, 150 N. W. 2d 507. *See also State v. Miller* (1967), 35 Wis. 2d 454, 151 N. W. 2d 157.

"The fixing of penalties for crimes is a Congressional function, and what constitutes adequate punishment is ordinarily left to the discretion of the trial judge. If the sentence is within the statutory limit, appellate courts will not interfere unless clearly cruel and unusual. *Hayes v. United States* (10th Cir. 1956), 238 Fed. 2d 318, 322, certiorari denied, 353 U. S. 983, 77 Sup. Ct. 1280, 1 L. Ed. 2d 1142. See also *Smith v. United States* (10th Cir. 1959), 273 Fed. 2d 462, 467, 468.

" 'Punishment is not "cruel and unusual," unless it is so greatly disproportionate to the offense committed as to be completely arbitrary and shocking to the sense of justice. *Weems v. United States*, 217 U. S. 349, 30 S. Ct. 544, 54 L. Ed. 793; *United States v. Rosenberg*, 2d Cir., 195 F. 2d 583, certiorari denied, 344 U. S. 838, 73 S. Ct. 20, 97 L. Ed. 687.' " *Rogers v. United States* (5th Cir. 1962), 304 Fed. 2d 520, 521, quoting from *Kasper v. Brittain* (6th Cir. 1957), 245 Fed. 2d 92, 96.

The Wisconsin court has not specifically set any standard for measuring "cruel and unusual punishment" involving prison sentences. However, in *State v. Seraphine* (1954), 266 Wis. 118, 121, 122, 62 N. W. 2d 403, the court sets forth a standard for determining whether a fine is excessive and in violation of art. I, sec. 6 of the Wisconsin Constitution. The court in that case applied the rule that:

" '. . . In order to justify the court in interfering and setting aside a judgment for a fine authorized by statute, the fine imposed must be so excessive and unusual, and so disproportionate to the offense committed, as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances. . . .' "

There is no apparent reason why this should not also be the standard for determining whether a particular prison sentence constitutes cruel and unusual punishment. Most state courts rely on a similar if not identical stan-

dard in cases involving questions of cruel and unusual punishment.[4]

In the present case an indeterminate eighteen-month sentence is not excessive or unusual nor disproportionate considering the offense committed. By the statute under which he was prosecuted, defendant could have been sentenced to five years and fined $1,000. (Sec. 944.10 (1), Stats.) The record shows that the defendant was on probation at the time of this offense. The trial judge had the benefit of a presentence investigation and in sentencing informed the defendant that he was imposing the sentence in view of the defendant's prior record. This court stated in *Waddell v. State* (1964), 24 Wis. 2d 364, 367, 368, 129 N. W. 2d 201:

"The court may utilize data contained in a presentence investigation report in determining an appropriate sentence. . . . Typically, such reports contain pertinent information relating to the defendant's . . . prior criminal record (if any)."

From the foregoing it is clear that the imposition of an indeterminate eighteen-month sentence for the offense was in no sense "cruel and unusual punishment," under either the United States or Wisconsin Constitutions.

*By the Court.*—Judgment affirmed.

---

[4] See 10 Words and Phrases, Cruel and Unusual Punishment, pp. 200, 201, 1967–68 Cumulative Pocket Part.