MUETZE, Plaintiff in error, v. STATE, Defendant in error.

*No. 75–92–CR. Argued May 5, 1976.—Decided June 14, 1976.*
(Also reported in 243 N. W. 2d 393.)

118

For the plaintiff in error there were briefs by *Howard B. Eisenberg*, state public defender, and *Jack E. Schairer*, assistant state public defender, and oral argument by *Jack E. Schairer*.

For the defendant in error the cause was argued by *Thomas J. Balistreri*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

BEILFUSS, C. J. The principal issue is whether a search warrant can be validly issued when based upon an affidavit disclosing private communications between husband and wife.

On May 22, 1973, at Bangor, Wisconsin, a hardware store was broken into and several small appliances stolen. This burglary was reported to the La Crosse County Sheriff's Department.

On May 23, 1973, two detectives of the La Crosse City Police Department responded to a domestic call at 607 Wall Street. At that address they talked to Geraldine Muetze, the defendant's wife. She told the officers her husband had shown her several small appliances in the basement and told her he could be making $50 per week on "this kind of stuff." The La Crosse city police officers gave this information to the La Crosse County Sheriff's Department.

Within the next few days the defendant and his wife separated. He moved to 125½ North Third Street and she to another address. On May 29, 1973, Deputy Sheriff Lisota served divorce papers on the defendant at the North Third Street address.

On May 30, 1973, Deputy Lisota made an affidavit in support of a search warrant for the North Third Street address to search for the articles taken during the Hussa burglary. The affidavit in part is as follows:

"2. On May 23, 1973, I received the following information from Detective Michael Abraham and Detective Donald Wenger of the La Crosse City Police Department. In an official report and by personal conversation Detectives Abraham and Wenger reported that on May 23, 1973, they responded to a domestic call at 607 Wall Street. They had conversation with a Mrs. Geraldine Muetze of La Crosse, who was then residing at 607 Wall Street. Mrs. Muetze related to Detectives Abraham and Wenger that upon her arrival at home on May 22, 1973, her husband Kenneth Muetze, who was unemployed, took her to the basement of their home, and showed her several small household appliances. She stated that there were at least two irons of a General Electric brand, portable hand mixers, and a can opener, and a black and white TV. When she asked her husband where he got the articles, he would not tell her, but said that 'he could be making $50.00 a week from now on on this kind of stuff.'

"Mrs. Muetze produced one of the steam irons, still in its original packaging, and turned it over to Detectives Wenger and Abraham.

"The iron, now in the possession of the Sheriff's Department, is in its original package, taped shut, with a shipping label affixed addressed to Hussa Hardware, Bangor, Wisconsin. Mr. Oscar Hussa of Hussa Hardware has identified the iron as one which was stolen from his hardware store on the late evening of May 21, or early morning of May 22, 1973.

" . . .

"She further related that when she arrived at home on May 23, 1973, these items were removed from the house at 607 Wall Street. Mrs. Muetze later related

that she and her husband had moved from 607 Wall Street, and that she presently resides at 432 Rose Street in North La Crosse in an upper rear apartment. She believed that her husband was living at 125½ North Third Street, La Crosse, with his brother Terry Muetze and a Richard Ness.

"3. On May 29, 1973, at 3:15 p.m., the affiant served a divorce summons on Kenneth Muetze at 125½ North Third Street. Kenneth Muetze stated that he was living there temporarily because of marital problems.

"4. Affiant believes Mrs. Geraldine Muetze to be a reliable source of information, although he does not know her personally. She is a private citizen coming forward with information to aid the police. She was an eyewitness to the events she describes, and has produced a portion of what she has seen, to verify the truth of what she says. Although she admits her motive in informing the police was to serve her own self interests, her description of what she produced was accurate, and proved to be truthful. In addition, the other facts which she related also proved to be true and correct.

"5. On the basis of the above information, affiant believes that the articles stolen from Hussa Hardware were on May 22, 1973, and still are, in the possession or control of Kenneth Muetze at his present residence, contrary to Section 943.34 Wis. Stats., and are evidence of a violation of Sec. 943.34 and 932.10 Wis. Stats."

Based on this affidavit, a warrant was issued authorizing the search of the 125½ North Third Street apartment. The warrant was executed in the afternoon of May 30, and the return was filed on May 31. The return indicated that a number of small appliances had been seized at the apartment.

On June 1, 1973, a criminal complaint was issued charging Kenneth Muetze with burglary. A preliminary hearing was held, probable cause was found, and the defendant was ordered held for trial in the circuit court on the burglary charge. At his arraignment in circuit court on June 18, 1973, the defendant stood mute and a plea of not guilty was entered in his behalf.

A *Goodchild-Miranda* hearing was conducted on June 29, 1973, to suppress statements given by the defendant while in custody. Those statements contained inculpatory remarks concerning his involvement in the burglary. Following the hearing the circuit court concluded that the statements had been made knowingly and intelligently and were not the result of coercion, force or promise. Subsequently, on July 19, 1973, the circuit court heard a motion by the defense to suppress the fruits of the search of the defendant's apartment. In support of the motion to suppress, the defendant argued that the search warrant was invalid because based in substantial part upon the disclosure of private marital communications. On August 20, 1973, an order, accompanied by a memorandum decision, was entered denying the motion to suppress.

The case was tried to a jury on September 17 and 18, 1973. The state's case consisted of testimony from three witnesses. The owner of the hardware store, Oscar J. Hussa, testified as to matters involving the discovery and reporting of the burglary and his subsequent identification of the items recovered as a result of the search. Richard Ness, an accomplice in the break-in, testified as to the defendant's role as a lookout. Deputy Lisota testified to the execution of the search warrant and to the statements made to him by the defendant while incarcerated in the La Crosse county jail. No witnesses were called by the defense. The jury returned a verdict of guilty on the burglary charge.

The defendant filed motions after verdict seeking a judgment of acquittal or, in the alternative, a new trial on the ground that the trial court erred in admitting any evidence obtained as a result of the May 30 search. It was again argued the search was illegal because based in substantial part upon the disclosure of private marital communications. An order denying the defendant's motions was entered on December 23, 1974.

At the time this case was tried the marital privilege was governed by the provisions of sec. 885.18, Stats. 1971. That section provided:

"**Husband and wife.** A husband or wife shall be a competent witness for or against the other in all cases, except that neither one without the consent of the other, during marriage, nor afterwards, shall be permitted to disclose a private communication, made during marriage, by one to the other, when such private communication is privileged. Such private communication shall be privileged in all except the following cases:

"(1) Where both husband and wife were parties to the action;

"(2) Where such private communication relates to a charge of personal violence by one upon the other;

"(3) Where one has acted as the agent of the other and such private communication relates to matters within the scope of such agency;

"(4) Where such private communication relates to a charge of pandering or prostitution;

"(5) Where such private communication relates to the abuse of a child by the husband or wife or both."

The defendant points out that the affidavit presented in support of the request for the warrant to search his apartment contains references to statements made by his wife to city of La Crosse police detectives. Those statements were to the effect that when Mrs. Muetze arrived home on May 22, 1973, the defendant took her to the basement and showed her several small appliances. When Mrs. Muetze asked her husband where he got the items the defendant refused to tell her but stated that " 'he could be making $50.00 a week from now on on this kind of stuff.' "

The state concedes that these statements constitute the disclosure of private marital communications within the meaning of sec. 885.18, Stats. 1971. Although there is but a limited reference in the affidavit to what the defendant actually said to his wife, "private communica-

tions" are not limited to oral or written exchanges but may also include expressive acts which are intended to convey information of a privileged character.[1] We believe that the defendant's action in taking his wife to the basement and showing her the items in question, when considered together with his statements, was such an "expressive act" as would constitute a "private communication" within the meaning of the statute.

The state contends that there is no authority 'for a broad exclusionary rule which would require the suppression of all information and leads obtained from the use of out-of-court disclosures of private marital communications. The marital privilege is no more than a rule of evidence. Law enforcement authorities are not prohibited thereby from using such disclosures as a source of other evidence or information.[2] It is only where the communications themselves, as defined above, are sought to be admitted into evidence in a judicial proceeding that the rule of exclusion applies.

■ ■ Here, the privileged statements were repeated in an affidavit presented in support of a request for a warrant to search the defendant's apartment. The affidavit, considered as a whole, satisfies the constitutional requirements of probable cause. The state points out that it is of no consequence that Mrs. Muetze's statements, as they appear in the affidavit, are hearsay. It is well-established that hearsay, when sufficiently credited to show reliability, may support a finding of probable cause

---

[1] *See:* McCormick, *Evidence* (hornbook series 2d ed.), p. 163, sec. 79; Annot. (1950), *"Communications" within testimonial privilege of confidential communications between husband and wife as including knowledge derived from observation by one spouse of acts of other spouse,* 10 A. L. R. 2d 1389.

[2] *See: United States v. Harper* (5th Cir. 1971), 450 Fed. 2d 1032, 1045; *United States v. Cleveland* (7th Cir. 1973), 477 Fed. 2d 310, 313; *United States v. Winfree* (E. D. Pa. 1959), 170 Fed. Supp. 659.

for the issuance of a search warrant.[3] Furthermore, there appears to be no Fourth Amendment prohibition against using privileged communications as the basis for a finding of probable cause to search. In *Hoffa v. United States* (1966), 385 U. S. 293, 302, 87 Sup. Ct. 408, 17 L. Ed. 2d 374, the Supreme Court stated that the Fourth Amendment does not protect a "wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it."

Nevertheless, the defendant contends that the marital privilege precludes the repetition by a third person, in a judicial proceeding to obtain a search warrant, of the unauthorized disclosures by one spouse of private marital communications. The defendant argues that without the disclosures by Mrs. Muetze there was no probable cause to issue the search warrant. The defendant concludes the search was illegal and the exclusionary rule should apply to prohibit the admission in evidence of any of the fruits of that search.

■ The state does not contend that the affidavit presents a sufficient basis for a finding of probable cause which would support the issuance of the search warrant without the disclosures by Mrs. Muetze. We believe the rules of privilege apply to proceedings before a magistrate to obtain a search warrant. This conclusion is supported by the new rules of evidence which specifically includes search warrants. Section 905.05, Stats. 1973, preserves the marital privilege. Section 911.01, entitled "Applicability of rules of evidence" provides in pertinent part:

"(3) PRIVILEGES: OATH. Chapter 905 with respect to privileges applies to all stages of all actions, cases and proceedings; s. 906.03 applies at all stages of all actions,

---

[3] *See: State v. Beal* (1968), 40 Wis. 2d 607, 613, 614, 162 N. W. 2d 640; *Leroux v. State* (1973), 58 Wis. 2d 671, 685, 207 N. W. 2d 589.

cases and proceedings except as provided in ss. 901.04 (1) and 911.01 (4), and ch. 908.

"(4) RULES OF EVIDENCE INAPPLICABLE. Chapters 901 to 911 (other than ch. 905 with respect to privileges) do not apply in the following situations:

"(a) *Preliminary questions of fact.* The determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the judge under s. 901.04 (1).

"(b) *Grand jury; John Doe proceedings.* Proceedings before grand juries or a John Doe proceeding.

"(c) *Miscellaneous proceedings.* Proceedings for extradition or rendition; sentencing, or granting or revoking probation, issuance of arrest warrants, criminal summonses and search warrants; proceedings with respect to release on bail pursuant to ch. 969 except where habeas corpus is utilized with respect to release on bail."

The state argues that the privilege should not apply to preclude the repetition by a third party of an out-of-court disclosure of private marital communications.

The parties cite conflicting federal authorities in support of their respective positions. It appears that the federal courts recognize two distinct common-law "privileges" arising out of the marital relationship. The first bars one spouse from testifying adversely to the other. The second bars the testimony of one spouse as to confidential communications of the other. *See: United States v. Harper, supra.* In *State v. Pratt* (1967), 36 Wis. 2d 312, 318, 319, 153 N. W. 2d 18, this court characterized the first principle as a form of incompetency and noted that, with the enactment of sec. 885.18, Stats. 1971, the legislature replaced the doctrine of incompetency with a narrow privilege of marital communications. Accordingly, the second principle recognized by the federal courts is substantially similar to the rule set forth in sec. 885.18. The federal cases do not always sharply distinguish between the two principles. The federal cases are relevant but not controlling in the interpretation of sec. 885.-18.

In the decisions relied upon by the defendant, the courts have held that the admission into evidence of testimony by federal agents as to the contents of statements made by a defendant's spouse violates the marital privilege.[4] In *Ivey v. United States, supra,* the fifth circuit cited *Hawkins v. United States* (1958), 358 U. S. 74, 79 Sup. Ct. 136, 3 L. Ed. 2d 125, where the Supreme Court reaffirmed the common-law marital privilege, and stated at page 772:

"The Hawkins case, supra, involved the admission of a wife's testimony in open court, but we know of no reason why the rule there reaffirmed is not equally applicable to a statement alleged to have been made by her out of court. She might as well be permitted to testify against her husband in open court as to permit the introduction of a statement she made against him out of court."

The decisions relied upon by the state also cite *Hawkins,* but indicate a general disapproval of the broad principle of incompetency affirmed there. *See: United States v. Mackiewicz* (2d Cir. 1968), 401 Fed. 2d 219, 225, certiorari denied 393 U. S. 923, 89 Sup. Ct. 253, 21 L. Ed. 2d 258; *United States v. Doughty* (7th Cir. 1972), 460 Fed. 2d 1360, 1364. In both cases the courts were inclined to hold that a federal agent could testify as to the contents of the spouse's statements. However, in neither case does it appear that a private communication was involved which would have been considered privileged under sec. 885.18, Stats. 1971. In *Mackiewicz, supra,* the court noted that an implied agency relationship existed between the spouses as to the subject matter at issue. In *Doughty, supra,* the court pointed out that the spouses were jointly engaged in the unlawful enterprise.

---

[4] *See:Ivey v. United States* (5th Cir. 1965), 344 Fed. 2d 770; *Peek v. United States* (9th Cir. 1963), 321 Fed. 2d 934, certiorari denied 376 U. S. 954, 84 Sup. Ct. 973, 11 L. Ed 2d 973; *United States v. Williams* (5th Cir. 1971), 447 Fed. 2d 894.

The state argues that the purpose of the marital privi-lege is to prevent marital discord. It contends that where one spouse chooses to disclose private communications out of court to the detriment of the other spouse, family harmony is past saving and no purpose is served by en-forcing the privilege. Furthermore, the state contends, the privilege is really designed to avoid the spectacle of one spouse appearing in court as a witness against the other. This possibility is avoided, the state points out, where the communications in question are repeated by a third party.

These arguments might be well taken in response to the rule which renders one spouse incompetent to testify against the other. The acknowledged purpose of that rule is to foster family peace and preserve the marriage relation. However, as noted above, sec. 885.18, Stats. 1971, specifically removes the common-law limitation of incompetency. The separate and distinct privilege which was adopted in its place is supported by the policy of encouraging marital confidences.[5] The damage which is thought to result from the unconsented-to disclosure of such communications extends beyond an individual marriage. The domestic confidence is a very important basis of the marriage relationship. That relationship is considered so valuable to society that it should be fostered by preserving or guaranteeing the confidential-ity of private communications in judicial proceedings.[6]

■ Marital confidences would not be meaningful if a spouse could decide to reveal the confidence to a third person and thereby destroy the protection of the privi-lege. We conclude that a communication which is privi-leged when made remains so, regardless of an un-

[5] *See: State v. Pratt, supra; Abraham v. State* (1970), 47 Wis. 2d 44, 176 N. W. 2d 349.

[6] *See:* McCormick, *Evidence* (hornbook series 2d ed.), pp. 161, 162, sec. 78; 8 Wigmore, *Evidence* (McNaughton Rev. 1961), p. 644, sec. 2333.

authorized out-of-court disclosure. The status of the particular marital relationship has no bearing on whether a privilege exists for marital communications. The fact that the defendant was served with a divorce summons shortly after his wife's disclosures is therefore irrelevant to the issue here. Section 885.18, Stats. 1971, prevents disclosure during the marriage or "afterwards."

■ ■ We hold that unauthorized out-of-court disclosures of private marital communications may not be used in a proceeding before a magistrate to obtain a search warrant. Therefore the warrant in this case was issued without probable cause. The search of the defendant's apartment was not legally authorized and the exclusionary rule set forth in *Mapp v. Ohio* (1961), 367 U. S. 643, 81 Sup. Ct. 1684, 6 L. Ed. 2d 1081, and restated by this court, albeit reluctantly, in *Conrad v. State* (1974), 63 Wis. 2d 616, 218 N. W. 2d 252, must apply to the fruits of that search.

The rule of exclusion must apply to the items seized in the search. However, it does not necessarily follow that either the defendant's in-custody statements or the testimony of Richard Ness, his accomplice, must be excluded under that principle. While the "fruit of the poisonous tree" doctrine requires the exclusion of the evidence obtained by exploitation of an illegal search and seizure, it does not bar evidence obtained by means sufficiently distinguishable to be purged of the primary taint of the illegality.[7]

■ Whether a witness' testimony must be excluded as a result of an illegal search appears to depend upon whether the identity of that witness became known to the police only as a direct result of the search.[8] Here it

---

[7] See: *Wong Sun v. United States* (1963), 371 U. S. 471, 83 Sup. Ct. 407, 9 L. Ed. 2d 441; *United States v. Fike* (5th Cir. 1971), 449 Fed. 2d 191.

[8] See: *Smith v. United States* (1965), 120 App. D. C. 160, 344 Fed. 2d 545; *United States v. Alston* (D. C. D. C. 1970), 311 Fed. Supp. 296; *People v. Drumright* (1970), 172 Colo. 577, 475 Pac. 2d 329.

is undisputed that Richard Ness was present in the apartment when the search warrant was executed. Some courts have recognized that the testimony of a witness discovered at the scene of an illegal search is inadmissible.[9]

■ However, in this case, Ness' identity was known to the police prior to the time the search was conducted. According to the affidavit prepared in support of the request for a search warrant, Mrs. Muetze "believed" that the defendant was living at the address in question with two others whom she believed to be his brother and "a Richard Ness." This knowledge was not the result of a privileged communication. Even if it were, the police would not have been precluded from using it as a source of other information. As a result, the identity of Richard Ness as a potential witness in the case was derived from a source sufficiently independent of the illegal search itself as to purge the testimony of the taint of that illegality.[10]

Statements made by the defendant to the police while in custody following his arrest were also presented in evidence at the trial. Following notice by the state that it intended to use the statements at the trial, the defendant sought and was granted a *Goodchild-Miranda* hearing to determine their admissibility under the standards set forth in those cases. The circuit court determined that the statements had been made knowingly and intelligently and were not the result of coercion, force or promise. The defendant has not challenged that finding on appeal. However, the defendant does argue that the statements were obtained as a result of the illegal search and that they must therefore be excluded.

---

[9] *See: People v. Albea* (1954), 2 Ill. 2d 317, 118 N. E. 2d 277; *State v. Rogers* (1963), 94 Ohio L. Abst. 110, 198 N. E. 2d 796.

[10] *See: Lockridge v. Superior Court* (1970), 3 Cal. 3d 166, 89 Cal. Rptr. 731, 474 Pac. 2d 683, certiorari denied 402 U. S. 910, 91 Sup. Ct. 1387, 28 L. Ed. 2d 652.

Recently, in *Brown v. Illinois* (1975), 422 U. S. 590, 95 Sup. Ct. 2254, 45 L. Ed. 2d 416, the Supreme Court held that the giving of the *Miranda* warnings cannot be considered per se to break the causal connection between an illegal arrest and the giving of statements. The fact that statements are found to have been given voluntarily under the Fifth Amendment was held not determinative of whether it was " '. . . sufficiently an act of free will to purge the primary taint . . .' " of a search or arrest which is illegal under the Fourth Amendment. However, the court also refused to adopt any alternative per se or "but for" rule which would automatically require the exclusion of such statements. Rather, the court stated:

". . . The question whether a confession is the product of a free will under Wong Sun must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, see Johnson v. Louisiana, 406 U. S. 356, 365, 32 L. Ed. 2d 152, 92 S. Ct. 1620 (1972), and, particularly, the purpose and flagrancy of the official misconduct are all relevant. . . ."

We believe, when measured by these standards, the defendant's custodial statements were "sufficiently an act of free will to purge the primary taint" of the illegal search. The circumstances of the statements are revealed by the transcript of the *Miranda-Goodchild* proceeding. It appears that the defendant was taken into custody immediately following the search on May 30, and was incarcerated in the La Crosse county jail. Matthew M. Corry, an attorney, stated he received a call that evening from the defendant at the jail and that he told him he

would be in the following morning to see him. When Corry went to see the defendant he asked him whether he had made any statement to the police. The defendant responded that he had not and Corry advised him not to do so.

Deputy Lisota stated that he was on duty on May 31, 1973, when he received a call at about 12:50 p.m., from the jail informing him that the defendant wanted to speak with a detective. Lisota testified the defendant informed him that he had talked with his lawyer and that his lawyer "had told him to keep his mouth shut, but he said this thing was bigger than we knew about and he wanted to tell us about it." The defendant was advised of his right to remain silent but proceeded to make statements concerning his involvement in the break-in. Lisota then asked the defendant if he would put his statements in writing and the defendant complied. The defendant conceded that he had asked to talk to detectives and that he voluntarily gave the statements in question.

In his concurring opinion in *Brown, supra,* Mr. Justice POWELL suggested that the statements involved in *Wong Sun* were "on the temporal extremes in relation to the illegal arrest." He noted that Toy's statement was obtained immediately after his arrest and appeared "to have been a spontaneous response to a question put to him in the frenzy of that event." Wong Sun's statement, on the other hand, was not given until after he was arraigned and released on his own recognizance. He later voluntarily returned to the station for questioning and his statement was preceded by an official warning of his rights to remain silent and to have counsel present if he desired. In the decision in *Wong Sun,* the court held Toy's statement inadmissible but concluded that, as to Wong Sun's statement, "the connection between the arrest and the statement had 'become so attenuated as to dissipate the taint.' "

The defendant's statements were given more than twelve hours after his arrest and after he had been advised of his rights under *Miranda*. It is true that the statements were given while still in custody following the search, but it is also true that they were given at the request of the defendant and were not the result of any interrogation. While there was not such an "intervening circumstance" as was present in either *Wong Sun* or *Johnson v. Louisiana, supra* (arraignment and court appearance for bail purposes), the statements here were volunteered *after* the defendant had spoken with his attorney and *after* that attorney had advised him to say nothing.

The court in *Brown* considered the purpose and flagrancy of the official misconduct involved to be of particular importance in determining whether a statement should be considered purged of the taint of illegality. Justice POWELL, in his concurrence, again indicated that the most readily identifiable categories of police conduct are represented by the extremes of flagrantly abusive violations of the Fourth Amendment on the one hand and mere "technical" violations on the other. Where there has been a flagrant illegality, Justice POWELL suggested, the "clearest indication of attenuation" should be required. In the case of "technical" violations, however, Justice POWELL sees "no legitimate justification [exists] for depriving the prosecution of reliable and probative evidence."

█ Here, the violation of the Fourth Amendment is clearly of a technical nature. It results not from any misconduct of the police but from the application of a rule of evidence. Under these circumstances the deterrent purpose of the exclusionary rule is not served by suppressing the voluntary statements. We conclude that neither the testimony of Richard Ness nor the statements of the defendant should be excluded as "fruits"

of the illegal search. The source of the testimony is sufficiently distinguishable from the illegal search as to be purged of the primary taint of the illegality.

The only evidence which should have been excluded is the testimony concerning the items actually seized in the search and the items themselves. The failure to exclude that testimony may well have had a prejudicial effect on the jury's verdict. We cannot stay it was nonprejudicial as a matter of law and therefore the conviction must be set aside. However, there is no reason to order a judgment of acquittal. A conviction for burglary does not require proof that any specific items, or any items at all, were actually taken. *See: Jandrt v. State* (1969), 43 Wis. 2d 497, 168 N. W. 2d 602.

*By the Court.*—Judgment and orders reversed and remanded for a new trial.