STATE of Wisconsin, Plaintiff-Appellant,

v.

Michael J. GUZY, Defendant-Respondent.†

Court of Appeals

No. 85–2104–CR. Submitted on briefs June 24, 1986.—Decided October 28, 1986.

(Also reported in 397 N.W.2d 144.)

† Petition to review granted.

401

For plaintiff-appellant, State of Wisconsin, there was a brief submitted by *Bronson C. La Follette*, attorney general, and *Marguerite M. Moeller*, assistant attorney general.

For defendant-respondent, Michael J. Guzy, there were briefs submitted by *Borns, Macaulay & Jacobson* by *Mark F. Borns*.

Before Cane, P.J., LaRocque and Myse, JJ.

CANE, P.J. The state appeals an order suppressing evidence and dismissing an armed robbery complaint against Michael J. Guzy. The trial court found unconstitutional an investigatory stop of the truck in which Guzy was a passenger. In addition, the trial court suppressed evidence it found tainted by the illegal stop, including a revolver and a $100 bill found during a consent search of the truck; an incriminatory statement Guzy made to a cellmate; statements by Kenneth Hunt, an accomplice and the truck's driver, that implicated Guzy; and an in-court identification of Guzy by a robbery victim.[1] We agree that the stop was illegal and that its illegality tainted Hunt's statements to

---

[1] After an initial dismissal based on a finding that the stop was illegal, the state reissued an armed robbery charge against Guzy based on evidence other than that seized from Hunt's truck immedi-

402

police. However, we determine that Guzy's statements to his cellmate and the in-court identification need not be suppressed. We further conclude that the admissibility of Hunt's later statements to police and the items found in the consent search of the truck depends on factual findings not made by the circuit court. Therefore, we affirm in part, reverse in part, and remand for determination of the voluntariness of Hunt's permission to search his truck and his later statements to police implicating Guzy.

A man armed with a revolver robbed a New Richmond grocery store at about two o'clock on the morning of April 13, 1985. The employees promptly called the police and described the robber as a slim man, five feet six inches tall, with long dark hair, a light beard, and wearing a blue vest with red stripes. No one saw the robber leave the store.

About twenty minutes after the robbery, Deputy Sheriff Robert Volkert heard the employees' description of the robber while routinely transporting a prisoner. Several minutes later, he drove onto interstate highway 94-West, a few miles from the Minnesota border, merging in behind a pickup truck. He noticed that the two occupants of the truck wore shoulder-length hair and that the passenger's hair was darker. Volkert concurred with his partner that a vehicle fleeing the robbery site could be in the same area as the truck they were trailing. After following the truck for thirty to forty seconds, Volkert decided to stop it to "investigate the situation further." The stop occurred at about 2:40 a.m.

The officers approached the truck and requested Hunt's identification. During a consent search of the

ately after it was stopped. Thus, the admissibility of the bags containing clothes and currency is not at issue.

truck's interior for weapons, they found a paper bag containing clothing and another containing what was later determined to be the robbery money. Volkert then arrested Guzy and Hunt, and transported them to the St. Croix County Jail in Hudson.

At about 4:30 that morning, two members of the New Richmond Police Department interviewed Hunt. After receiving a Miranda warning, Hunt made a statement implicating Guzy in the robbery.

Two days later, Hunt gave the police permission to search his truck. Inside the truck, police found a .32 caliber revolver and a $100 bill. The same afternoon, Guzy's cellmate gave a statement detailing how Guzy, several hours after being jailed, had admitted and described the robbery to him.

More than two weeks after the robbery, Hunt gave an additional statement to the police that further implicated Guzy in the robbery. Hunt then explained that he had earlier given permission for the police to search his truck because he had been worried that children might find the revolver under the dashboard and injure themselves.

At the April 24 preliminary examination, a store employee identified Guzy as the robber from a four-person lineup.

## GUZY'S STANDING TO CHALLENGE THE STOP

The state raises for the first time on appeal the issue of Guzy's standing as a passenger to challenge an investigatory stop of the truck Hunt was driving. Though Guzy argues that the state waived its right to contest his standing, we will consider the issue. A

reviewing court may decide a constitutional question not raised at trial if justice compels a decision and the facts are uncontested. *State v. Copening*, 103 Wis.2d 564, 571, 309 N.W.2d 850, 853-54 (Ct. App. 1981). Here, because the investigatory stop is the underlying basis for the arrest and triggers Guzy's fourth amendment protections, justice compels a decision. The parties have briefed the issue and neither contests the facts necessary to our discussion. *See Wirth v. Ehly*, 93 Wis.2d 433, 444, 287 N.W.2d 140, 146 (1980). Because the fourth amendment protects Guzy as a passenger from unreasonable search and seizure, we conclude that he properly challenges the stop.

The state bases its challenge to Guzy's standing on *Rakas v. Illinois*, 439 U.S. 128 (1978), and several other decisions that cite *Rakas* as holding that a passenger has no standing to challenge a vehicle stop. In *Rakas*, the Supreme Court upheld the admissibility of evidence seized from a car in which the defendants were passengers. *Id.* at 149-50. The *Rakas* Court avoided treating the question as one of standing. Instead, the Court framed the question substantively, as "whether the challenged search or seizure violated the Fourth Amendment rights" of a criminal defendant who seeks to exclude evidence obtained during it. *Id.* at 139-40.

The *Rakas* Court reasoned that because fourth amendment rights could not be asserted vicariously, a passenger must be able to demonstrate that he or she had a legally recognizable interest in the areas searched. *Id.* at 133, 148. This interest, according to the *Rakas* Court, "depends not upon a property right in the invaded place but upon whether the person who claims the protection of the [Fourth] Amendment has a legiti-

mate expectation of privacy in the invaded place." *Id.* at 143.

The *Rakas* Court explained that whether an expectation of privacy is legitimate depends not on the defendant's subjective beliefs, but on what "society is prepared to recognize as 'reasonable.'" *Id.* at 143 n.12. The Court concluded that the trunk, glove box and back seat of a car are generally areas that a passenger may not reasonably expect society to recognize as protected by the fourth amendment. *Id.* at 148-49. Because the defendants in *Rakas* asserted no possessory interest in the places within the automobile yielding the challenged evidence, the Court concluded that their fourth amendment rights had not been infringed.

Here, the question is not whether Guzy has standing to challenge the subsequent search of another's truck, but whether, as a passenger, an illegal stop infringed his fourth amendment rights. Under the *Rakas* framework, we must exclude evidence obtained in violation of fourth amendment rights. *Id.* at 134.

A passenger may challenge the legality of a vehicle stop. Wisconsin recognizes that an investigatory stop triggers fourth amendment protections. *State v. Goebel,* 103 Wis.2d 203, 208, 307 N.W.2d 915, 918 (1981). Moreover, federal constitutional law views the stopping of a car in the same manner as it does a seizure of that car's occupants. *Delaware v. Prouse,* 440 U.S. 648, 653 (1979). Consequently, an occupant's location within a stopped car has no bearing on that person's fourth amendment right to be free from unreasonable seizure. *See People v. Kunath,* 425 N.E.2d 486 (Ill. App. 1981).[2] The notion that stopping a vehicle does not simultaneously stop its

_____

[2] *See also State v. Beja,* 451 So.2d 882 (Dist. 4, Fla. App. 1984); *State v. Eis,* 348 N.W.2d 224 (Iowa 1984).

passengers defies common sense. Thus, it is not surprising that in cases relying on *Rakas,* we find little support for the proposition that passengers have no standing to challenge a vehicle stop.[3] We conclude that Guzy properly challenges the legality of the stop because the fourth amendment guarantees his freedom from unreasonable seizure regardless of where he sits within a vehicle.

## THE LEGALITY OF THE STOP

The state contends that Volkert had a reasonable basis to stop the truck. We conclude, however, that the facts available to Volkert at the time of the stop were not sufficient to justify an investigatory stop.

An officer may stop a person for a reasonable length of time when the officer "reasonably suspects that such person is committing, is about to commit or has committed a crime . . . ." Section 968.24, Stats. To justify the reasonableness of such a stop, an officer must prove "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Wendricks v. State,* 72 Wis.2d 717, 723, 242 N.W.2d 187, 191 (1976) (quoting *Terry v. Ohio,* 392 U.S. 1, 21 (1968)). The same standard applies to automobiles. *Jones v. State,* 70 Wis.2d 62, 68-69, 233 N.W.2d 441, 444-45 (1975). Officers may stop an automobile if they have an "articulable and reasonable suspicion that . . . either the vehicle or an occupant is . . . subject to seizure for violation of law." *State*

---

[3] *United States v. Cardona,* 524 F.Supp. 45, 47 (W.D. Tex. 1981); *Kayes v. State,* 409 So.2d 1075, 1077 n.2 (Dist. 2, Fla. App. 1981); *State v. Cowen,* 662 P.2d 230, 232 (Idaho 1981).

*v. Washington*, 120 Wis.2d 654, 660, 358 N.W.2d 304, 307 (Ct. App. 1984) (quoting *Prouse*, 440 U.S. at 663).

Here, because the essential facts are undisputed, we independently review whether a stop meets the fourth amendment standard of reasonableness. *Washington*, 120 Wis.2d at 660-61, 358 N.W.2d at 307. We must decide whether the facts available at the time of the stop support a reasonable suspicion, or whether Guzy's stop arose merely from an "inchoate and unparticularized suspicion or 'hunch.' " *Terry*, 392 U.S. at 27. However, because the *Terry* standard for gauging the reasonableness of a stop is an objective one, we need only answer whether the facts support a reasonably cautious officer's belief that the action taken was appropriate. *Id.* at 21-22.

■ Here, the facts known to Deputy Volkert as he followed Hunt's truck were inadequate to support a reasonable suspicion that the occupants of that truck were subject to seizure for a violation of the law. Although hindsight supports Deputy Volkert's hunch, the protection of constitutional rights requires us to rely on foresight. To condone this stop would expose future victims of unreasonable hunches to violations of their fourth amendment rights. The record lends support to this observation. From a transcript of communications of the St. Croix County Emergency Communications Center on the morning of the robbery, it can be seen that in the moments following the robbery report a flurry of stops were made. The transcript hints at several stops but sheds no light on whether they were reasonable:

> Officer: I think you might as well stay up there until we get a little more information. Mick is stopping a

car out at the golf course, Hill has another one of our cars out there, and Gary's still at the store.

Officer: Ten-four. I stopped two up on the north end, and they were okay.

Initially we note that Volkert and his partner observed no driving or equipment violations that would have justified even a routine traffic stop. In addition, Volkert's hypothesis as to the location of a vehicle fleeing the robbery was speculation, not fact. No one saw how the robber left the scene of the crime. The robber could have been anywhere in an immense area centered at the New Richmond grocery store and radiating outward half an hour's travel time in all directions. Because authorities knew nothing of the robber's direction or mode of travel, the probability that he would be at any one point within this area was no greater than the probability of any other long-haired person being at that point.

Moreover, Volkert and his partner could see nothing of the truck's occupants but the backs of their heads. Thus, Guzy's long hair, visible only through the pickup truck's back window, was the only feature Volkert could match to the broadcast description of the robber. The state has not shown that the length or style of Guzy's hair was so unusual as to be identifiable in itself. Moreover, the mere fact that an officer observes that a truck's passenger has hair of similar length and color to that of a robbery suspect's is an insufficient basis for seizing that person. Multiplying this single similarity by the probability that the robber would be at that particular point does nothing to bolster the reasonableness of Volkert's suspicion.

The Wisconsin Supreme Court has recognized that under certain circumstances, a suspect's presence in an

automobile can add to the reasonableness of a stop even though only further observation would be justified if the suspects were pedestrians. *Wendricks*, 72 Wis.2d at 724, 242 N.W.2d at 191. In *Wendricks*, police observed two men in a taxicab near the scene of a recent, two-man robbery. Police noticed that the two "seemed to be watching" them in a prolonged and concerned manner. *Id.* at 720, 242 N.W.2d at 189. The *Wendricks* court held that the defendants' suspicious behavior and their number, combined with the fact that they sat in an automobile and were therefore capable of rapidly fleeing, rendered an investigatory stop reasonable. *Id.* at 724, 242 N.W.2d at 191.

Here, Guzy and Hunt engaged in no suspicious behavior while being followed. Nor did officials know anything of an accomplice. Thus, the facts were insufficient to render reasonable Volkert's suspicions. By *Terry's* objective standard, Volkert's stop of Guzy was merely the result of a hunch.

We conclude there were not enough facts available to Volkert when he made the stop to support a reasonable suspicion that Guzy had violated the law. Consequently, the stop and subsequent arrest were illegal.[4]

## SUPPRESSION OF EVIDENCE

█

The suppression of evidence is not a constitutional right, but rather a judge-made device to deter unreasonable police conduct. *State v. Verkuylen*, 120 Wis.2d 59, 60, 352 N.W.2d 668, 669 (Ct. App. 1984). Having deter-

---

[4] We note that an illegal arrest no longer deprives the trial court of personal jurisdiction over a defendant. *State v. Smith*, 131 Wis.2d 220, 224, 388 N.W.2d 601, 603 (1986).

mined that the stop was unconstitutional, we must examine the trial court's suppression order with this deterrent policy in mind.

Generally, evidence obtained through an unconstitutional seizure must be suppressed. *State v. Griffin*, 126 Wis.2d 183, 187, 376 N.W.2d 62, 64 (Ct. App. 1985). However, not all evidence need be suppressed simply because it would not have been discovered "but for" a fourth amendment violation. *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963). Rather, the question properly before us is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *State v. Kraimer*, 91 Wis.2d 418, 432, 283 N.W.2d 438, 444 (Ct. App. 1979) (quoting *Wong Sun*, 371 U.S. at 488).

Whether a violation of fourth amendment rights warrants evidentiary suppression presents a question of "constitutional fact." *State v. Woods*, 117 Wis.2d 701, 715, 345 N.W.2d 457, 465 (1984). A question of "constitutional fact" is one requiring the application of constitutional principles to the facts as found by the trial court. *Id.* We apply constitutional principles independent of the trial court. *Id.* at 715–16, 345 N.W.2d at 465.

## A. GUZY'S STATEMENTS TO HIS CELLMATE

The state argues that Guzy's statements to his cellmate were sufficiently an act of free will to purge any taint from the illegal stop. We agree.

411

■

If there is a close causal connection between a defendant's in-custody statements and illegal police conduct, the statements are inadmissible. *Dunaway v. New York*, 442 U.S. 200, 217-18 (1979). Gauging this causal connection varies with the facts of each case, but Wisconsin courts have applied guidelines suggested by the United States Supreme Court in *Brown v. Illinois*, 422 U.S. 590 (1975); *Kraimer*, 91 Wis.2d at 433-34, 283 N.W.2d at 445. Under the *Brown v. Illinois* analysis, a court must weigh the "temporal proximity" of the arrest and the statement, the presence of intervening circumstances and the purpose and flagrancy of the official misconduct, in order to determine whether a statement arose through official exploitation of an illegal arrest. *Brown v. Illinois*, 422 U.S. at 603-04.[5]

■

We cannot conclude under the *Brown v. Illinois* analysis that police obtained Guzy's statements to his cellmate through exploitation of the illegal arrest. Although Guzy's admissions closely followed his arrest, we find it significant that he spoke to a cellmate, not to police. There is no evidence that any police action prompted the statements. Because Guzy made his statements to a cellmate free from police influence, we conclude that it was "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun*, 371 U.S. at 486.

---

[5] This test, as enunciated in *Brown v. Illinois*, underlies many opinions dealing with the suppression of evidence tainted by an illegal seizure. Rather than continually citing to *Brown v. Illinois*, however, we rely on related Wisconsin cases with factual situations more appropriate to the facts before us.

An analysis based on the exclusionary rule's deterrent policy yields the same result. The exclusionary rule hampers the search for truth while it guards the sanctity of our society's constitutional rights. However, because society also values public safety, the goals of deterring police misconduct and convicting criminals must be weighed against each other. *State v. Noll*, 111 Wis.2d 587, 590-91, 331 N.W.2d 599, 601 (Ct. App. 1983). There is little to be gained where applying the rule would have no deterrent effect on future police misconduct.

Here, Guzy inexplicably and voluntarily told a cellmate about his involvement in an armed robbery. Police did absolutely nothing, other than placing Guzy in the cell, to encourage this behavior. It is doubtful that by recreating these circumstances, officials could rely on future prisoners to similarly implicate themselves. A police officer, aware that he is about to make an illegal stop, will not be deterred by our suppressing evidence "that he could not have anticipated obtaining when he indulged in the prohibited practice." *People v. Walker*, 183 N.W.2d 871, 876 (Mich. App. 1970).

Because Guzy's statements to his cellmate represented an act of free will purged of taint from the original police misconduct, and because suppressing the statements would have no deterrent effect on future police misconduct, we conclude that the evidence is admissible.

## B. ITEMS FOUND IN TRUCK SEARCH

The state argues that Hunt's consent to the truck search represented an act of free will sufficiently purged of any taint from the illegal stop. We conclude that the

413

trial court's findings are inadequate to support such an argument.

Guzy's challenge to the admissibility of the revolver and the $100 bill flows from his objection to these items as fruits of the illegal stop. Had the stop been proper, the state may have been able to challenge Guzy's standing under *Rakas*. Nonetheless, we must determine whether the original unlawful stop tainted the evidence obtained through the consent search of Hunt's truck, not whether Guzy has standing, as a mere passenger, to challenge the search of another's vehicle.

Because we focus on the connection between the unlawful stop and the items discovered in the search of Hunt's truck, we must determine whether Hunt's consent came about through official exploitation of the illegal stop. Thus, we must determine whether Hunt's consent was "sufficiently an act of free will to purge the primary taint." *Brown v. Illinois*, 422 U.S. at 598–99; *see also State v. Ribera*, 597 P.2d 1164, 1170 (Mont. 1979).

In *Ribera*, the Montana Supreme Court rejected an illegally arrested defendant's challenge to inculpatory evidence obtained through a car search performed with the owner's consent. The *Ribera* court applied *Brown v. Illinois* and concluded that despite the illegality of the defendant's arrest, the owner's consent to the later car search had been a sufficient intervening act of free will to purge the taint of the illegal arrest. *Ribera*, 597 P.2d at 1170. The court based its determination on specific trial court findings indicating an absence of police threats, promises, or coercion directed at the car's owner.

Here, the state argues that Hunt's expressed fear of children finding the gun and injuring themselves operated as an intervening event that removed the taint of

the illegal stop. We note, however, that a locked and police-impounded vehicle is unlikely to present a danger to curious children. Without more detailed trial court findings, we are unable to determine, as a matter of constitutional fact, whether Hunt's consent arose as an act of free will or whether it represented a convenient rationalization arising under police coercion.

Thus, we cannot determine the presence or absence of intervening circumstances or the existence of official exploitation of the illegal stop without further factual development of the circumstances leading to Hunt's consent. We remand this issue for a finding on the voluntariness of Hunt's consent.

## C. HUNT'S INITIAL STATEMENT TO POLICE

■■■■

Whether a witness' statements must be excluded as the result of a fourth amendment violation depends on whether his or her identity became known to police directly through the violation. *Muetze v. State*, 73 Wis.2d 117, 130, 243 N.W.2d 393, 399 (1976). Because Hunt's statements stemmed from an illegal stop, we must determine whether those statements represented police exploitation or whether they were sufficiently distinguishable from the illegal stop to be purged of the primary taint. *Id.* at 131, 243 N.W.2d at 399.

In *Muetze*, the Wisconsin Supreme Court upheld the admissibility of an accomplice's testimony against the defendant. *Id.* at 130–31, 243 N.W.2d at 399. The accomplice had been discovered during an illegal search of the defendant's apartment. Although noting that the testimony of a witness discovered during an illegal search may be suppressed, the *Muetze* court admitted

the accomplice's testimony into evidence because the police knew of his identity as a potential witness through a source unrelated to the illegal search. *Id.*

Here, Hunt's first statement implicating Guzy occurred within hours of their illegal arrest. The state has failed to show that any source independent from the illegal stop would have led police to discover Hunt's identity.[6] Moreover, the state has failed to show any circumstances intervening in the chain of events between the illegal stop and Hunt's questioning. Therefore, we uphold the suppression of Hunt's in-custody statement made shortly after his arrest.

## D. HUNT'S LATER STATEMENTS TO POLICE

Two weeks after the robbery, Hunt made additional statements implicating Guzy in the robbery. From the record, we cannot determine whether these statements represented an act of free will that sufficiently attenuated the link between the statements and the illegal stop, or whether they arose from official exploitation of the illegal stop. Because this question was not answered at the suppression hearing, we remand the issue to the trial court for a determination of whether the statements were an act of free will that sufficiently attenuated the link between those statements and the illegal stop. *See Brown v. Illinois*, 422 U.S. at 603–04.

---

[6] We also note that Hunt offered his statement to police while faced with overwhelming evidence linking him to the grocery store robbery. *See State v. Verhagen*, 86 Wis.2d 262, 270–71, 272 N.W.2d 105, 109 (Ct. App. 1978).

## E. THE IN-COURT IDENTIFICATION OF GUZY

The state argues that intervening events sufficiently attenuated the link between a victim's in-court identification of Guzy and any taint of the illegal stop. We agree. At Guzy's pretrial hearing about two weeks after the robbery, his attorney staged a four-person lineup. There, a store clerk identified Guzy as the man who had robbed her. Wisconsin recognizes that an in-court identification must not result from exploitation of an illegality. *State v. Brown*, 50 Wis.2d 565, 569, 185 N.W.2d 323, 325 (1971).

In *State v. Brown*, police arrested the defendant on an armed robbery charge and brought him to the police station for questioning. Soon after the arrest, police requested two robbery eyewitnesses to appear at the police station in order to identify the defendant. One witness saw and identified the defendant as police took him off an elevator in the police building. The other witness identified the defendant while he sat in the district attorney's office. At a preliminary hearing, the original trial judge found the defendant's arrest illegal and consequently suppressed all evidence stemming from it, including personal observations, statements to police, and physical evidence. *Id.* at 568, 185 N.W.2d at 325.

At trial before another judge, however, the state introduced the same two eyewitnesses who then identified the defendant in court. The trial court admitted the testimony over the defendant's objections and later ruled that the in-court identifications were not tainted by the illegal arrest. The Wisconsin Supreme Court affirmed, holding under the *Wong Sun* test, that the in-

court identifications had been obtained through means sufficiently distinguishable from the illegal arrest. *State v. Brown*, 50 Wis.2d at 569, 185 N.W.2d at 325–26. The *State v. Brown* court noted that an in-court identification can stand independent of an illegal out-of-court identification. *Id.*

The United States Supreme Court analyzed the admissibility of an in-court identification in *United States v. Crews*, 445 U.S. 463 (1980). In *Crews*, police illegally arrested and photographed a man who fit a victim's description of an armed robber. The victim then identified the defendant from the illegally obtained photograph. The defendant, however, had also been observed near the scene of the crime by another witness. The *Crews* Court confirmed its position that the exclusionary sanction applies to fruits of a constitutional violation. *Id.* at 470. However, the *Crews* Court cited three exceptions that render the exclusionary rule inappropriate: (1) where the evidence challenged has been derived through a source independent from the constitutional violation; (2) where the state can show that the evidence would have been inevitably discovered regardless of the violation; and (3) where the evidence arises through a connection sufficiently attenuating the link between the evidence and the illegality. *Id.* at 470.

The *Crews* Court held that although the out-of-court photographic identification was inadmissible, the victim's in-court identification of the defendant was not tainted. The *Crews* Court reasoned that the other witness provided police with "reasonable independent grounds" for suspecting the defendant. Furthermore, the Court held that the victim's recollection had not been influenced by the improper photographic identification.

Here, we conclude that under *State v. Brown* and *Crews*, the store clerk's in-court identification of Guzy is admissible. Although the state has failed to satisfy the "independent source" and "inevitable discovery" exceptions,[7] Guzy's statements to his cellmate served to remove the taint of the illegal stop from the in-court identification. Because Guzy, free from police influence, admitted his involvement in the robbery to his cellmate, we cannot conclude that the in-court identification stemmed directly from the illegal stop. Guzy's voluntary act sufficiently attenuated the causal chain between the illegal stop and the in-court identification. Therefore, we follow *State v. Brown*'s holding that an in-court identification may stand independent of an earlier constitutional violation.

*By the Court.*—Order affirmed in part, reversed in part, and cause remanded with directions.

---

[7] *See Nix v. Williams,* — U.S. —, 104 S.Ct. 2501 (1984) (inevitable discovery exception). Furthermore, the state failed to show that police had any source except the illegal stop that would have led them independently to either Hunt or Guzy.