STATE of Wisconsin, Plaintiff-Appellant-Cross-Petitioner,

v.

Michael J. GUZY, Defendant-Respondent-Petitioner. †

Supreme Court

*No. 85–2104–CR. Argued May 28, 1987.—Decided June 24, 1987.*

(Also reported in 407 N.W.2d 548.)

† Motion for reconsideration denied.

664

For the plaintiff-appellant and cross-petitioner the cause was argued by *Marguerite M. Moeller,* assistant attorney general, with whom on the briefs was *Donald J. Hanaway,* attorney general.

For the defendant-respondent-petitioner there were briefs by *Mark F. Borns,* and *Borns, Macaulay & Jacobson,* Madison and oral argument by *Mark F. Borns* and *Richard B. Jacobson.*

WILLIAM A. BABLITCH, J.   The State of Wisconsin (State) seeks review of a published decision of the court of appeals, *State v. Guzy,* 134 Wis. 2d 399, 397 N.W.2d 144 (1986), affirming in part and reversing in part a trial court order which suppressed certain evidence and dismissed a criminal complaint against the defendant, Michael J. Guzy (Guzy).

The evidence was obtained after law enforcement officers stopped the vehicle in which Guzy was a passenger. The State argues, first that Guzy does not have standing to challenge the reasonableness of the stop, and, second that even if Guzy does have standing the evidence should not have been suppressed. We conclude that Guzy does have standing; we further conclude that under the circumstances presented, the initial investigative stop of the vehicle by law enforcement officers was reasonable and therefore all evidence is admissible.

The facts surrounding the stop of the vehicle in which Guzy was a passenger are as follows. On April

13, 1985, at approximately 2:00 a.m. a man robbed Krueger's Super Value (Krueger's) in New Richmond, Wisconsin. Employees called the police and a description of the robber was broadcast over the police radio. The robber was described as a white male, 5′5″–5′8″, with dark shoulder length hair and a beard, a slim build, wearing sunglasses and a blue vest with red stripes. No information was given concerning a getaway vehicle nor was there any indication that more than one individual participated in the robbery. Deputy Sheriff Ronald Volkert (Volkert) and Auxiliary Deputy Sheriff Roland Brinkman (Brinkman) of the St. Croix County Sheriff's Department heard this description at approximately 2:30 a.m. while transporting a prisoner from the River Falls Police Department to the county jail in Hudson.

As Volkert and Brinkman's squad car entered Interstate 94 off of Highway 35 west bound, they pulled directly behind a blue Ford pickup truck with Minnesota license plates traveling towards the Minnesota border. Their attention was called to the truck because both male occupants had very long shoulder length hair. The deputies also noted that the driver's hair was a lighter color and the passenger's was a much darker color.

Volkert and Brinkman followed the truck for 30–40 seconds during which time they discussed that a vehicle leaving Krueger's after the robbery could be in the area at about that time and the fact that the occupants had unusually long hair which fit the description of the grocery store robber's hair length. Based on this information, the deputies decided to stop the truck in order to further scrutinize the occupants. The stop was made at approximately 2:40 a.m. within two miles of the Minnesota-Wisconsin border.

Volkert approached the driver, asked for and was presented with a temporary Minnesota drivers license issued to Kenneth Hunt. Volkert radioed for a further description of the robbery suspect and was given essentially the same information that had been previously broadcast. Volkert observed that Guzy, the passenger, had a slight beard growth and a slim build. He also noticed that Guzy was wearing an unzipped gray sweatshirt without an undershirt. Volkert asked Guzy to step out of the truck so that he could pat him down for weapons. When Guzy emerged from the vehicle, Volkert noticed a small brown paper grocery bag, protruding from under the passenger seat. Volkert removed the bag, opened it to look for a gun and found a large amount of money. Both Guzy and Hunt were then arrested.

The driver, Hunt, gave a statement to Police Chief Levi (Levi) and Sergeant Jarchow (Jarchow) of the New Richmond Police Department at approximately 4:20 a.m. Hunt had been given the *Miranda* warnings and responded that he understood his rights. Hunt said he and Guzy had gone to a New Richmond bar and that later he had fallen asleep in his truck while Guzy went elsewhere. Hunt was awakened when, upon his return, Guzy threw a paper bag into the truck under the passenger seat, saying "money, money, money" and told Hunt to "go, go, go." Hunt said Guzy had been wearing a blue shirt and blue vest, but wore different clothing upon his return. Guzy told Hunt to keep his "mouth shut" and "don't tell the police anything."

On April 15, Hunt gave Chief Levi permission to search the truck, which had been sealed and locked following the robbery. A .32 caliber chrome gun was found under the dashboard on the passenger side.

Police also found a $100 bill stuffed inside a soda can in the front seat area of the truck. On April 30, Hunt gave a second more detailed statement to probation and parole agent James Jablonski (Jablonski). He related that Guzy robbed the store in order to pay a $500 fine at the Anoka Minnesota County Courthouse. Hunt also stated that he consented to the April 15 truck search because he feared that some children might find the gun and be injured.

On April 15, Gari Vance (Vance), Guzy's cell-blockmate at the St. Croix County Jail, gave a sheriff department investigator an oral statement concerning the armed robbery at Krueger's. Vance, disclaimed any prior knowledge of the crime and said Guzy told him he was brought into the jail for armed robbery of Krueger's grocery store. According to Vance, Guzy told him he used a .32 caliber gun during the robbery and that the gun was underneath the dashboard of Hunt's truck. Guzy told Vance he had taken the store employees into a back room after placing the money in a brown paper bag; upon leaving the store he shed his clothes while running through people's yards, including a vest worn during the robbery and that he put on other clothes when he got back to Hunt's truck parked nearby.

On April 15, 1987, Guzy was charged with the April 13, 1985, robbery of Krueger's in violation of sec. 943.32(2), Stats. Guzy was bound over for trial following a preliminary hearing on the armed robbery charge on April 24, 1985. During the preliminary hearing a line-up was arranged to allow store employee Hanson an opportunity to identify the robber. From the four-man line-up, Hanson identified Guzy as the armed robber.

Guzy filed motions challenging the personal jurisdiction of the court over him, arguing that the stop of Hunt's truck was without probable cause, contrary to sec. 986.24, Stats., art. I sec. 8 and 11 of the Wisconsin Constitution and the fourth, fifth, and fourteenth amendments of the United States Constitution. He sought to suppress evidence seized by law enforcement officers from the truck on April 13. The trial court determined the stop was illegal and dismissed the complaint because the court lacked personal jurisdiction over Guzy.

The State issued an amended complaint on August 7, 1985, based on evidence other than that seized from Hunt's truck. Guzy then filed motions to suppress: 1) Hunt's statement to Levi and Jarchow: 2) Hunt's statement to Jablonski; 3) Vance's statement; 4) the .32 caliber revolver; 5) the $100 bill found in the soda can; and 6) the Hanson in-court identification. The motions to suppress were based on the theory that the evidence supporting the charge was obtained as a result of the illegal stop of the vehicle and resulting arrest of Hunt and Guzy. The trial court determined the evidence supporting the reissuance of the complaint was the "fruit" of the illegal stop and arrest. It therefore suppressed the evidence and dismissed the complaint.

The court of appeals agreed that the investigatory stop of the truck was illegal and that the illegality tainted Hunt's first statement to law enforcement officer. However, the court of appeals held that Guzy's statements to his cellmate and his in-court identification by employee Hanson need not be suppressed. Additionally, the court of appeals found that the admissibility of Hunt's second statement to law enforcement officers and the items seized in the consent

search of the truck depended upon factual findings not made by the trial court; accordingly, the court of appeals affirmed in part, reversed in part, and remanded the matter to the trial court for determination of the voluntariness of Hunt's permission to search his truck and his later statement to law enforcement officers which implicated Guzy in the robbery.

In reviewing an order suppressing evidence, this court will uphold the trial court's findings of fact unless they are against the great weight and clear preponderance of the evidence. *State v. Flynn,* 92 Wis. 2d 427, 437, 285 N.W.2d 710 (1979). However, the issues reviewed in this appeal, 1) Guzy's standing to challenge the truck stop and 2) the legality of the initial investigative stop, are questions of law and therefore we are not bound by the lower courts' decisions on these issues. *See State v. Wisumierski,* 106 Wis. 2d 722, 733, 317 N.W.2d 484 (1982); *State v. Williamson,* 113 Wis. 2d 389, 401, 335 N.W.2d 814 (1983).

The threshold issue, raised by the State, is whether Guzy has standing to challenge the stopping of the vehicle? The State contends that Guzy lacks standing because as a "mere passenger"[1] he does not have a legitimate expectation of privacy in the uninterrupted travel of the vehicle. The State reasons that a passenger, by ceding some control over his or her person to the driver, forfeits the right to be free of governmental interference while in the vehicle.

---

[1]In its brief the State defines "mere passenger" as "one lacking any property or possessory interest in the vehicle...." Supreme court brief of plaintiff-appellant-cross-petitioner, p. 15.

The rights guaranteed by the fourth amendment to the United States Constitution and art. I, sec. 11 of the Wisconsin Constitution are personal rights. *Rakas v. Illinois,* 439 U.S. 128, 138–39 (1978). The determination of whether a person has standing to challenge the actions of law enforcement officers depends upon whether the actions of the officers infringed on an interest which the fourth amendment of the United States Constitution and article I, sec. 11 of the Wisconsin Constitution were designed to protect. *E.g., State v. Eis,* 348 N.W.2d 224, 226 (Iowa 1984) ("standing in fourth amendment cases is determined by inquiring whether the challenged search or seizure violated an interest of the defendant that the fourth amendment was designed to protect"). We conclude that because Guzy was the target of the vehicle stop in this case, the stop was a "seizure" of Guzy within the meaning of the fourth amendment and art. I, sec. 11, and therefore infringed on an interest of Guzy protected by the fourth amendment and art. I, sec. 11. Accordingly, Guzy has the requisite standing to challenge the stop.[2]

In this case, the attention of the law enforcement officers was drawn to the truck because its occupants had shoulder length hair. The following testimony from the preliminary and suppression hearings demonstrates beyond a doubt that the purpose of the stop was directed at Guzy. The officers stopped the vehicle for the purpose of detaining Guzy in order to get a better look at him.

---

[2]We do not deal with the issue of a passenger's standing to challenge the stop when the passenger is not the target of the stop.

"Q   Was your attention called to the vehicle in any way?

"[Officer Volkert] A   It was called to the occupants of the vehicle.

"Q.   And why was your attention so called to the vehicle?

"A   Because both occupants have very long shoulder-length hair.

"Q   Were you able to look at—at the color of hair at all?

"A   I could—I could tell that the driver's hair was a lighter color than the passenger's hair. The passenger's hair was a darker color.

"Q   And did that observation match with any other information that you had received?

"A   We had received that—the information that the person that had held up Krueger's Super Valu (sic) in New Richmond had long, dark shoulder-length hair."

*Suppression Hearing*

"Q   (By Mr. Lundell, continuing) Okay. Now, Officer, as you entered onto the freeway and as you noticed the pickup truck that you have testified to, what occurred at that point?

"A   When we first entered the interstate and pulled behind the pickup truck, my attention was brought to the two individuals that were in the pickup truck.

"Q   Okay. And why is that?

"A   Because of their long hair, shoulder-length long hair.

"Q   What color?

"A    The driver of the truck, his was a lighter color; the passenger of the vehicle had a much darker color. ...

"...

"Q    ... What was there about the length of hair, color of hair of the passenger that caught your attention?

"A    The color of the hair was dark, and it was unusually long, shoulder-length hair.

"Q    And why were you looking at those factors?

"A    Because only a few moments before I had copied a radio description of the individual who had been involved with the incident at Krueger's."

■

Support for this conclusion that Guzy has standing is readily found in the fundamental guarantees of the United States and Wisconsin Constitutions which provide for "[t]he right of the people to be secure in their persons, ... against unreasonable ... seizures...." United States Constitution, amend. IV, Wis. Const. art. I, sec. 11. This court has stated that "the basic purpose of this prohibition is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *State v. Boggess,* 115 Wis. 2d 443, 448–49, 340 N.W.2d 516 (1983); *e.g., Camara v. Municipal Court,* 387 U.S. 523, 528 (1967). We have also recognized as has the United States Supreme Court that stopping an automobile and detaining its occupants is a "seizure" which triggers fourth amendment protections. *State v. Goebel,* 103 Wis. 2d 203, 208, 307 N.W.2d 915 (1981); *Delaware v. Prouse,* 440 U.S. 648, 653 (1979).

Whether an individual who is a target of a law enforcement stop, has been stopped at home, in the

street, or in a vehicle, as a driver or passenger, the result is the same: the person has been deprived of freedom of movement in precisely the same degree. The fourth amendment and art. I, sec. 11 guarantee "the right of the people to be secure in their person." Neither provides any exception that is dependent upon the location of the person seized. *See Prouse,* 440 U.S. at 653–54, 662–63.

We conclude Guzy has standing. Therefore we turn to the issue of the reasonableness of that seizure, the initial investigative stop.

Though stopping a vehicle and detaining its occupants constitutes a seizure within the meaning of the fourth amendment, *see Prouse,* 440 U.S. at 653, certain investigative stops, prompted by an officer's suspicion that the occupants have committed a crime, may in certain circumstances be constitutionally permissible even though the officer lacks probable cause to arrest. *United States v. Hensley,* 469 U.S. 221, 226 (1985). The test is an objective test. Law enforcement officers may only infringe on the individual's interest to be free of a stop and detention if they have a suspicion grounded in specific, articulable facts and reasonable inferences from those facts, that the individual has committed a crime. *Id., Wendricks v. State,* 72 Wis. 2d 717, 723, 242 N.W.2d 187 (1976). An "inchoate and unparticularized suspicion or 'hunch' ..." will not suffice. *Terry v. Ohio,* 392 U.S. 1, 27 (1968).

This test focuses on the reasonableness of the governmental intrusion. It "balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged

to justify the intrusion." *Hensley,* 469 U.S. at 228. The societal interest implicated is the ability of law enforcement officers to make an investigative stop when a crime has been recently committed which thereby promotes the strong societal interest in "solving crimes and bring offenders to justice." *Id.* at 229.

We recognize the incantation of the traditional test for investigatory stops—"specific and articulable facts"—at times provides little guidance for courts and law enforcement officials in determining the quantum and nature of information necessary to establish the reasonableness of the stop. We agree with Professor LaFave that "[n]o litmus paper test is available to resolve this issue ...." 3 Wayne R. LaFave, *Search and Seizure,* sec. 9.3(d), at 461 (2d ed. 1987). Nevertheless, the law must be sufficiently flexible to allow law enforcement officers under certain circumstances, the opportunity to temporarily freeze a situation, particularly where failure to act will result in the disappearance of a potential suspect. *See* A Model Code of Pre-Arraignment Procedure, 270–72 (1975). The question is when.

The answer to that question does not lend itself to a simple answer or a black letter rule that governs law enforcement conduct in making investigative stops. The Constitutions of the United States and Wisconsin demand reasonableness. The fundamental question is at what point does the important societal interest in solving crime and bringing offenders to justice *reasonably* justify the specific intrusion on personal security, i.e, an investigative stop.

LaFave identifies six factors that various courts have found helpful in making the required determination.

"(1)   the particularity of the description of the offender or the vehicle in which he fled; (2)   the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3)   the number of persons about in that area; (4)   the known or probable   direction   of   the   offender's   flight; (5)   observed activity by the particular person stopped; and (6)   knowledge or suspicion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation." 3 LaFave, *supra* p. 10, at 461.

■

We agree that these factors are helpful and conclude that these factors must be considered in reaching the required determination. But the presence of some or all of these factors frequently does not end the problem for the law enforcement officers or the courts because questions remain. How many facts must be present in a given stop? What weight do we give these facts? When does the presence of one or more of these factors cross the line from being a "hunch" into being a "reasonable" suspicion? In balancing the nature and quality of the intrusion on personal security against the importance of the societal interest, at what point does the scale tip to reasonably justify the stop even though there are insufficient facts to establish probable cause? We conclude that the answer, at least in part, is found in the facts *and* circumstances present in this case.

The State concedes that the only physical feature linking the passenger to the armed robbery was his dark shoulder length hair. An additional fact present was that the truck was spotted in a location and at a time that would be consistent if a vehicle had been

utilized by the armed robber to flee the scene. These are the only "specific and articulable" facts known to the officer at the time of the arrest. But these facts did not exist in a vacuum. There was present at the time other factors. First, there was no alternative means of further investigation available to the officer short of actually making the stop. Second, if the officer did not react immediately, the opportunity for further investigation would be lost. Third, the description known to the officer would allow him to quickly determine the presence or absence of these features with minimal intrusion to the passenger.

█

We conclude that the presence of these further circumstances are relevant in determining the weight to be given to the known facts in deciding the question of the reasonableness of the investigative stop. Inasmuch as the focus is on reasonableness, the presence or absence of these circumstances can bear on the weight that can reasonably be given to the known fact or facts. Are alternative means of further investigation available, such as a license plate check, closer observation of the suspects, or obtaining additional information? If so, the reasonableness of the stop based on scant facts may well be questionable. Is there a possibility that if law enforcement officers do not act immediately the opportunity for further investigation would be lost? A minimal amount of facts may, under these circumstances, be given greater weight than if the opportunity to act in the future is not foreclosed. What actions would be necessary following the stop for law enforcement officers to determine whether to arrest or release the suspected individual? Will the stop create the opportunity to corroborate a known

physical feature of a suspect or clothing description with minimal intrusion on personal security?

We conclude that the reasonableness of an investigative stop depends upon the facts *and* circumstances that are present at the time of the stop. Given a triggering fact or facts of suspicion, law enforcement officers and reviewing courts may also consider the circumstances that were present in determining the weight to be given those facts in making the balance between the intrusion and the societal interest.

In sum, a balance must be struck between the interests of society in solving crime and bringing offenders to justice and the rights of members of that society to be free from unreasonable intrusion. Our conclusion strikes that balance. The focus is on reasonableness. It is, under many circumstances, a very difficult test to apply, particularly by a law enforcement officer confronted with a situation in which he or she may have but a few seconds in which to make a determination. It is impossible to write a black letter rule that governs law enforcement officers' conduct under such circumstances. It is a rule of reasonableness: was the action of law enforcement officers reasonable under all the facts and circumstances present?

We recognize that a law enforcement officer cannot, in the few seconds sometimes available to him or her, always articulate at the moment all of the facts and circumstances that motivate their action. Instinct based on training, experience and circumstances may well lead that officer to the correct decision notwithstanding his or her ability to articulate either at the time or even after the fact, to him or herself or others, the reasons for the action. We cannot demand that

and we do not. The law expects reasonableness, and the courts must take into account the factors outlined in this opinion in judging the reasonableness of law enforcement officer's actions. The ultimate question is, given the facts and circumstances present, does the important societal interest in solving crime and bringing offenders to justice reasonably justify the specific intrusion on personal security, i.e., the stop? With LaFave's factors and the circumstances just described in mind, we now turn to a consideration of the totality of the facts and circumstances in this case which we conclude support the legality of the stop.

■

We begin with the facts. Volkert and Brinkman knew an armed robbery had occurred within the last one-half hour. The deputies knew the robber was male and that he had dark, shoulder length hair. The passenger in the truck appeared to be a male with dark shoulder length hair. We acknowledge that this was the only physical feature linking the truck's passenger to the robbery. Nonetheless, the current uniqueness of men with shoulder length hair renders this match particularly significant. *See, e.g., People v. Flores,* 524 P.2d 353 (Cal. 1974). We agree with courts and commentators that the most important consideration concerning a physical description "is whether the description is sufficiently unique to permit a reasonable degree of selectivity from the group of all potential suspects." 3 LaFave, *supra* p. 10, at 464. We further agree with the argument advanced by the State that

"... while a match between the shoulder-length hair of an armed robber and a male spotted by police after the crime would be unremarkable if

the individual were seen at noon hour on the University of Wisconsin-Madison campus in 1969, the same hair match would assume greater significance at 2:30 a.m. in St. Croix county during 1985." State of Wisconsin brief in the court of appeals, p. 18.

We conclude the uniqueness of long hair, coupled with the fact that there were very few vehicles on the road at 2:30 a.m., increased the likelihood that the truck's occupants were involved in the robbery. *See, e.g., People v. Brown,* 410 N.E.2d 505, 509–10 (Ill. App. 1980) ("police are justified in making a stop at an early morning hour with a much less comprehensive description of suspects than would be adequate if the stop were made at midday.")

We also note the time the deputies sighted the vehicle and its location was consistent with the time of the robbery and the distance a vehicle could have traveled from the robbery scene in that amount of time. *See, e.g., People v. Mascarenas,* 666 P.2d 101, 108 (Colo. 1983) (approximately 15–20 minutes after report of armed robbery, police observed a vehicle in a location consistent with the amount of time required to travel from robbery scene).

Deputy Volkert was a life long resident of New Richmond and a 13 year veteran of the St. Croix County Sheriff's Department. He was therefore very familiar with the area and traveling distances from New Richmond to other points. Volkert's testimony at the suppression hearing indicates the importance of the known physical feature—long hair—and the location of the truck to his determination to stop the truck. He stated:

"I first commented to Deputy Brinkman something like, 'boy, look at those guys; they've got long, shoulder-length hair, and that's the description that we had of the person that had just held up Krueger's', and I made comment to the fact that, 'boy, if it would have been those guys, and they would have held up Krueger's, they'd have been down in this area about this time.'"

We now consider the circumstances surrounding the stop in this case. Volkert and Brinkman had received a fairly specific physical description of the armed robber. Because the truck they were following was traveling at highway speed at night they had no means of corroborating the physical description short of stopping the vehicle. An additional circumstance was the very real concern that they would lose their opportunity to investigate because the truck was within two miles of the Minnesota border. Finally, the officers knew that by briefly stopping the truck and getting a closer look at the truck's occupants they could quickly corroborate the physical description or ascertain that the occupants did not fit the description.

Confronted with these facts and circumstances, we conclude that the deputies acted reasonably in freezing the situation by means of the vehicle stop in order to further investigate. Indeed, given these facts and circumstances, it would have been poor law enforcement work if this vehicle which was about to leave their jurisdiction, had been permitted to continue on without further inquiry. *See Terry,* 392 U.S. at 23. Accordingly, Guzy's evidentiary challenges must fail. All evidence obtained as a result of the investigative stop is admissible.

*By the Court.*—The decision of the court of appeals is affirmed in part and reversed in part.

HEFFERNAN, CHIEF JUSTICE (*dissenting*). The majority adopts a "reasonable suspicion" test that is both incorrect and unconstitutional. It would allow a stop where an otherwise insufficient quantum of facts observed by a police officer can be supplemented with various subjective circumstances—such as a belief that the offender will otherwise go unpunished or that an opportunity to possibly obtain additional information will otherwise be foregone—that the officer decides are present. The majority believes that a stop is constitutional if it is "reasonable under the circumstances." (Majority opinion at 679.) The " ultimate question," it held, is whether society's interest in solving the crime and bringing the offenders to justice reasonably justifies the stop.

*Terry v. Ohio,* 392 U.S. 1 (1968), and the cases that have followed it, have set forth a reasonable suspicion test that focuses on the amount of factual information available to the officer before the stop is made. *Terry* provides that reasonable suspicion is present "where a police officer observes unusual conduct which leads him to reasonably conclude in light of his experience that criminal activity may be afoot." 392 U.S. at 30. Other cases have defined reasonable suspicion as "founded suspicion," "a particularized and objective basis for suspecting the particular person stopped of criminal activity," and "adequate suspicious circumstances to justify a temporary detention for the purpose of inquiry." *See,* 1 LaFave & Israel, *Criminal Procedure* at 302–03. These tests all depend on the presence of a certain quantum of factual information; they leave no room for subjective beliefs that a stop is

"necessary" either because there is no alternate means of investigation available, or to take advantage of an opportunity that may otherwise be lost. None of these tests authorizes a stop in order to attempt to obtain more information which may, when coupled with facts already available to the officer, only then rise to the level of reasonable suspicion.

The majority thus adopts a reasonable suspicion test that does not square with *Terry* and its progeny. Its test improperly ignores the emphasis of those cases on the presence and degree of factual information available to the officer who makes the stop. In allowing a police officer's subjective determination to be taken into account, the majority elevates society's interest in apprehending offenders above the constitutional right to be free from unreasonable stops.

Here, only two "facts" were available to the police officers. The vehicle's occupants had shoulder-length hair and the vehicle was observed at a proximity from the scene of the crime that was consistent with the time that had elapsed since the robbery took place. I find that these two facts did not rise to the level of creating a reasonable suspicion. The stop was therefore unconstitutional, and the presence of special "circumstances" relied upon by the majority cannot make it any less so. The majority today adopts a reasonable suspicion test that affords defendants a lesser degree of constitutional protection under the Wisconsin constitution than the United States Supreme Court has held must be afforded under the Fourth Amendment. This it cannot do. States may only choose to afford individuals identical rights or more rights under their own constitutions than would be available under the United States Constitution. U. S. Const., Art. VI, cl. 2.

I am authorized to state that JUSTICE ABRA-HAMSON joins in this dissent.