STATE of Wisconsin, Plaintiff-Respondent,

v.

Alisha M. OLSON, Defendant-Appellant.

Court of Appeals

*No. 00–3383–CR. Oral argument October 16, 2001.—Decided November 28, 2001.*

2001 WI App 284

(Also reported in 639 N.W.2d 207.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Elizabeth Cavendish-Sosinski* and *Daniel P. Fay* of *Oakton Avenue Law Offices, S.C.*, Pewaukee. There was oral argument by *Daniel P. Fay*.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James M. Freimuth*, assistant attorney general, and *James E. Doyle*, attorney general. There was oral argument by *James M. Freimuth*.

Before Nettesheim, P.J., Brown and Anderson, JJ.

¶ 1. ANDERSON, J. Alisha M. Olson appeals from a judgment of conviction for party to the crime of burglary, contrary to Wis. Stat. §§ 943.10(1)(a) and 939.05(1) (1999–2000).[1] On appeal, she challenges the trial court's order denying her motion to suppress statements made by her to a Waukesha county sheriff's detective during a traffic stop on the grounds that the

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

stop was violative of her Fourth Amendment rights. Because we determine that the stop was constitutional, we disagree and affirm the judgment.

¶ 2. The facts are from the suppression hearing and are undisputed. On August 16, 1999, police officers from the Waukesha County Sheriff's Department were dispatched to the Sorgenfrei residence in the Town of Genesee to respond to a report of a burglary. While investigating the scene of the burglary, the officers received a radio call with information from We Tip, a crime stoppers-type hotline. The anonymous caller stated that his girlfriend had been involved in some burglaries with two other girls, namely, Olson and Jaclyn Falk. The officers then proceeded to Olson's residence, but she was not there. Her mother informed them that Olson was out with Falk and she paged Olson. Olson called her mother, but when her mother told her that some sheriff's officers wanted to talk to her, she hung up. She made several more calls to her mother asking if the officers were still there and informed her mother that she was not coming home with Falk. After one and one-half hours of waiting, the officers finally left the Olson residence.

¶ 3. During that time, the officers elicited information from Olson's mother. The previous evening, Falk had stayed over with Olson, and on the morning of August 16, 1999, the two had gotten up around 8:00 a.m. to go to court in Oconomowoc for an "underage ticket." They returned home and left again several times throughout the day, finally returning around 5:00 p.m. Olson's mother stated that they were using Olson's car that day. The Sorgenfrei burglary took place between 8:30 a.m. and 1:30 p.m. that day, and the officers concluded that Olson and Falk had the opportunity to commit the offense. Furthermore, the Sorgenfreis'

daughter went to school with both Olson and Falk. The anonymous tipster recontacted the police on August 17.

¶ 4. On August 18, the case was assigned to Detective Richard Bach and he went to the Olson residence to try to talk to Olson. No one answered the door, but he noticed that her car was there. Bach called Olson's mother at work, and she explained that perhaps Olson was in the shower and could not hear that someone was at the door. Olson's mother said that if Olson's car was there, she probably was too, and she had to be to work by 10:00 a.m. Bach parked down the block to wait and see if Olson would leave. About fifteen minutes after Bach's call to her mother, Olson left home in her car. Shortly thereafter, Bach turned on his emergency lights and performed a traffic stop on Olson's car. Olson did not violate any traffic laws prior to the stop. During the stop, Olson made statements to Bach.

¶ 5. Olson filed a motion to suppress the statements she made to Bach during the traffic stop on the grounds that the stop was violative of her Fourth Amendment rights. The trial judge looked at the circumstances surrounding the traffic stop. He found that in looking at all of the facts, specifically the two anonymous tips, Olson's opportunity to commit the crime and her evasive behavior, Bach was justified in making the stop and that he had reasonable suspicion to investigate. Following the trial court's ruling, Olson entered a plea of guilty and a judgment of conviction was entered on November 9, 2000. On appeal, Olson now challenges the order denying her motion to suppress statements made during the traffic stop.

¶ 6. The Fourth Amendment protects the people from unreasonable searches and seizures. At the outset,

we note that it has been "long acknowledged that 'stopping an automobile and detaining its occupants constitute a "seizure" within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief.' " *Berkemer v. McCarty*, 468 U.S. 420, 436–37 (1984) (citation omitted). Therefore, we need not determine whether the stop was a seizure, but rather whether the seizure was reasonable. Since the facts here are undisputed, we have only to review those facts to decide whether the constitutional requirement of reasonableness has been satisfied. *State v. McGill*, 2000 WI 38, ¶ 17, 234 Wis. 2d 560, 609 N.W.2d 795. The question is one of law and "therefore we are not bound by the trial court's decision on that issue." *State v. Gruen*, 218 Wis. 2d 581, 590, 582 N.W.2d 728 (Ct. App. 1998).

¶ 7. Under the Fourth Amendment, and the corresponding article I, section 11 of the Wisconsin Constitution, the constitutional imperative is that all seizures be objectively reasonable under the circumstances existing at the time of the seizure. *State v. Rutzinski*, 2001 WI 22, ¶ 13, 241 Wis. 2d 729, 623 N.W.2d 516. "[T]o pass muster under the Fourth Amendment and Article I, Section 11, an officer initiating an investigative stop must have, at a minimum, a reasonable suspicion that the driver or occupants of the vehicle have committed an offense." *Rutzinski*, 2001 WI 22 at ¶ 14. Reasonable suspicion must be based not on an "inchoate and unparticularized suspicion or 'hunch,' " but on "specific reasonable inferences which [an officer] is entitled to draw from the facts in light of his [or her] experience." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). "At the time of the stop, the officer must be able to point to specific and articulable facts which, taken

together with rational inferences from those facts, objectively warrant a reasonable person with the knowledge and experience of the officer" to believe that a crime has been, or is about to be, committed. *Rutzinski*, 2001 WI 22 at ¶ 14.

¶ 8. In the present case, we find sufficient facts to give rise to a reasonable suspicion that Olson had committed a crime. The Waukesha County Sheriff's Department did not pull Olson's name out of a hat. An anonymous caller to We Tip first made it suspect Olson. However, the two calls to the hotline were not the only facts stacking up against Olson. While talking to her mother, the officers discovered that Olson had the opportunity to commit the burglary. Finally, Olson's purposeful avoidance of the officers evidenced at least a guilty conscience. Although avoidance of the police and refusal to cooperate may be founded in wholly innocent intentions and without more do not create reasonable suspicion, *Florida v. Bostick*, 501 U.S. 429, 437 (1991), "cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion," *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). In addition to specific facts, "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Id.* at 125. In looking at the totality of the circumstances, *see Gruen*, 218 Wis. 2d at 590, a reasonable police officer could reasonably suspect that Olson was somehow involved in the burglary.

¶ 9. However, the constitutional standard of reasonableness for a seizure is not met solely based on the presence of reasonable suspicion. *See State v. Guzy*, 139 Wis. 2d 663, 679, 407 N.W.2d 548 (1987). "[T]here is 'no

ready test for determining reasonableness other than by balancing the need to search or seize against the invasion which the search or seizure entails.' " *Terry*, 392 U.S. at 21 (citation omitted). In evaluating the need to seize, the court must consider the governmental interests involved. *Id.* at 22. In *Terry*, the governmental interests were those of crime prevention and the need to temporarily freeze a situation to resolve ongoing, possibly criminal, ambiguities. *See id.* However, "[t]he factors in the balance may be somewhat different when a stop to investigate past criminal activity is involved rather than a stop to investigate ongoing criminal conduct." *United States v. Hensley*, 469 U.S. 221, 228 (1985).

¶ 10. *Hensley* involved the traffic stop of a suspected armed robber twelve days after the robbery took place. *Id.* at 223. Wanted flyers describing Hensley and his involvement in the crime were distributed to police departments in the Cincinnati metropolitan area, but until the chance encounter on the streets of a Cincinnati suburb, the police had been unable to locate him. *Id.* at 223–24. The *Hensley* Court noted several ways in which the governmental interests at play in investigative stops of suspects of past criminal activities differed from those cited in *Terry*. *Hensley*, 469 U.S. at 228.

> As we noted in *Terry*, one general interest present in the context of ongoing or imminent criminal activity is "that of effective crime prevention and detection." A stop to investigate an already completed crime does not necessarily promote the interest of crime prevention as directly as a stop to investigate suspected ongoing criminal activity. Similarly, the exigent circumstances which require a police officer to step in before a crime is committed or completed are not necessarily as pressing long afterwards. Public safety may be less threatened by a suspect in a past crime who now appears to be

going about his lawful business than it is by a suspect who is currently in the process of violating the law. Finally, officers making a stop to investigate past crimes may have a wider range of opportunity to choose the time and circumstances of the stop.

*Hensley*, 469 U.S. at 228–29 (citation omitted).

¶ 11. Despite these differences between ongoing and past criminal activities, the *Hensley* Court refused to require a finding of probable cause in order to make an investigatory stop of a suspect of a past crime reasonable. *See id.* at 229. There is a "strong government interest in solving crimes and bringing offenders to justice" which would be compromised if police could not make reasonable seizures in the absence of probable cause when investigating past crimes. *Id.* "Restraining police action until after probable cause is obtained would not only hinder the investigation, but might also enable the suspect to flee in the interim and to remain at large." *Id.* Especially when the police have been unable to locate the suspect, "[t]he law enforcement interests at stake in these circumstances outweigh the individual's interest to be free of a stop and detention that is no more extensive than permissible in the investigation of imminent or ongoing crimes." *Id.*

¶ 12. As the Wisconsin Supreme Court stated in *Guzy*, the "fundamental question is at what point does the important societal interest in solving crime and bringing offenders to justice *reasonably* justify the specific intrusion on personal security." *Guzy*, 139 Wis. 2d at 676. In answering that question, both the facts and the circumstances of a case must be considered. *Id.* at 677. "Given a triggering fact or facts of suspicion, law enforcement officers and reviewing courts may also consider the circumstances that were present" in deter-

mining the balance struck between the interests of society and the individual. *Id.* at 679. "It is a rule of reasonableness: was the action of law enforcement officers reasonable under all the facts and circumstances present?" *Id.*

¶ 13. As previously stated, the facts of this case give rise to a reasonable suspicion that Olson was involved in the burglary. The anonymous tip first alerted the police of her possible involvement. A conversation with her mother revealed that she and Falk had had the opportunity to commit the crime as they came and went from the house several times that day. Finally, her refusal to cooperate with the police evidenced a guilty conscience. Taken as a whole, these facts are sufficient to support reasonable suspicion, and given these facts, it would have indeed been poor police work to not suspect Olson.

¶ 14. We then turn to the circumstances of this case. The police officers visited Olson's residence while she was out with Falk. Olson's mother paged her to request that she come home and speak with the officers. Olson refused to do so and proceeded to call her mother several times to determine if the police officers were still at the house. Olson was purposely not available to the officers at that time. Later, Bach returned to the house to try to get some answers from Olson. Those answers could have confirmed or denied Olson's involvement in the burglaries. He knocked on the door but there was no response. A call to Olson's mother revealed that Olson would soon be leaving the house to go to work. Olson had already demonstrated a blatant refusal to cooperate with the investigation. Bach knew that a traffic stop would restrict the movement of Olson for a limited period of time in order to ask her a few

questions. Given her penchant for stonewalling, we cannot say that this was an unreasonable action.

¶ 15. These circumstances parallel those in *Hensley* where the police had been unable to locate the suspect. *Hensley*, 469 U.S. at 229. Here, although the police had a good idea of where Olson was, her stonewalling made any attempt at voluntary conversation impossible. A traffic stop became a reasonable solution to further the investigation. We do not say that reasonable suspicion of a past crime always justifies a traffic stop. A seizure, especially in the traffic stop context, is a serious intrusion on an individual's liberty and must be objectively reasonable by Fourth Amendment standards. Courts must balance the intrusion on the individual against the governmental interests of the State. Here, the reasonable suspicion that Olson was involved in the burglary, the strong governmental interest in solving crimes, and the purposeful avoidance of the police by Olson make Bach's traffic stop a reasonable one under the facts and circumstances of this case. Accordingly, Olson's evidentiary challenge must fail, and any statements made by her during the traffic stop are admissible. We therefore uphold Olson's judgment of conviction.

*By the Court.*—Judgment affirmed.