STATE of Wisconsin, Plaintiff-Appellant,

v.

Vernell T. WILLIAMS, Defendant-Respondent.

Court of Appeals

*No. 02–0384–CR. Submitted on briefs August 9, 2002.—Decided October 3, 2002.*

## 2002 WI App 306

(Also reported in 655 N.W.2d 462.)

396

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *David J. O'Leary*, district attorney, and *Scott H. Dirks*, assistant district attorney, Janesville.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Michael A. Haakenson* of *Haakenson & Haakenson*, Janesville.

Before Vergeront, P.J., Dykman and Lundsten, JJ.

¶ 1. VERGERONT, P.J. The State appeals from the trial court's order granting Vernell Williams's motion to suppress evidence discovered in his vehicle and statements he made after he was stopped by a police officer. The State contends the trial court erred in concluding that the officer who stopped him did not have the requisite reasonable suspicion for an investigative detention. We conclude the officer had the requisite reasonable suspicion to stop Williams's vehicle to determine if he was the suspect in a domestic abuse

incident. We also conclude that, because the initial detention was lawful, the officer could properly ask Williams his name and for identification even if she had already decided he was not the suspect. However, we do not agree with the State that we can decide on the present record whether the officers unlawfully prolonged the detention to obtain Williams's consent to search his vehicle, whether he consented to the search, whether the consent if given was voluntary, and whether there are grounds to suppress Williams's statements. Findings of fact must be made before these issues can be decided. We therefore reverse and remand for further proceedings.

## BACKGROUND

¶ 2. Officer Mary Garcia of the Beloit Police Department testified as follows at the hearing on Williams's motion to suppress. On June 16, 2001, she responded to a domestic abuse incident in Beloit. The complainant told Officer Garcia that her boyfriend, Demetrius Phillips, had a handgun and had been disorderly at the house. The complainant described Phillips as a black male in his twenties, approximately five feet six inches, weighing 150 or 160 pounds, and stated that he was driving a dark blue Chevrolet Euro 90's model with a red pinstripe and tinted windows. Officer Garcia had never met Phillips, but by June 20, 2001, she had seen a 1999 photo of him.

¶ 3. On the afternoon of June 20, while on duty, Officer Garcia observed a young black male driving a four-door blue Chevrolet Euro with a red pinstripe at an intersection a few blocks from the scene of the domestic abuse incident. The vehicle had a temporary registration plate. Officer Garcia could not remember at the hearing, but she did not think this vehicle had

tinted windows. Officer Garcia activated her squad car lights and pulled the vehicle over to see if the driver was Phillips. The driver identified himself as Vernell T. Williams and gave his date of birth, 9–02–84, but he did not have a driver's license or any other identification to prove his identity. At the time Officer Garcia stopped him, she did not think she had seen Williams before, but by the time of the hearing she had realized she had had prior contact with him.

¶ 4. Officer Garcia called Officer Henderson over the police radio to ask if he would be able to identify Vernell Williams, and Officer Henderson said yes. Officer Garcia called Officer Henderson because he had a lot of contacts and knew a lot of people. Officer Henderson arrived at the scene and confirmed that the person in the vehicle was Williams. Officer Garcia had Williams's name and birth date run through the dispatcher and learned that Williams did not have a valid driver's license. Officer Garcia asked Williams to step out of the car. Officer Henderson patted Williams down. At some point Officer Garcia asked Williams if she could search his car, and Williams said "yes." Officer Garcia found nothing in the interior of the vehicle, but in the trunk she found a substance she believed to be cocaine.

¶ 5. Officer Garcia testified that at no time did Williams indicate that she could not search the vehicle and he was never upset with her searching the vehicle. She testified initially that, when she asked him if she could search his car, Williams was standing next to his car. She testified later that she asked if she could look in his trunk, and he said yes; she asked him this after he was put in one of the squad cars. Officer Garcia acknowledged that she did not issue Williams a citation for having an invalid driver's license.

¶ 6. Williams did not testify, but he called Canneta Baumann, who lived on the street where Williams was stopped. She testified that she was outside and saw the car being pulled over across the street. She heard a female police officer say "get out of the car" and saw a man get out. She did not know the man, but she identified him as Williams, who was sitting in the courtroom. She saw him get out of the car, and he talked with the officer briefly, but she could not hear. She then saw them walk to the squad car and saw Williams get into the squad car. The female officer walked back to the blue car, stuck her head in and went back to the squad car and talked to Williams with the door open. Baumann could not hear what the officer was saying, but she heard Williams yell "why are you in the fucking car without my permission." Baumann went in and out of her house a couple of times during the incident. She did not see the officer searching the car.

¶ 7. Officer John Fahrney of the Beloit Police Department also testified. When he learned on the police radio that Williams had been pulled over, he told Officer Garcia over the radio to attempt to obtain consent to search Williams's vehicle. When Officer Fahrney later arrived at the scene, Williams was already in the squad car and drugs had been found in his vehicle. Officer Fahrney believed Williams had been sitting in the squad car for less than ten minutes before Officer Fahrney arrived at the scene. Officer Fahrney read Williams his *Miranda*[1] rights. Williams agreed to talk to him. Williams told the officer the cocaine found in the car belonged to him and he intended to sell it. Officer Fahrney had talked to Baumann and she showed him where she was standing in her yard when

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

she saw the incident. It was about 100 yards from the cars, and it was his opinion it would be hard to hear a conversation at that distance at that busy intersection. Baumann's statement to Officer Fahrney on what she saw and heard was similar to her testimony at the hearing. On cross-examination Officer Fahrney acknowledged that he did not have Williams sign a waiver of rights form the department has, and did not type up Williams's statement and give it to him to read.

¶ 8. The trial court granted Williams's motion to suppress, concluding that the initial stop violated the Fourth Amendment. The court decided that the description of a 90's blue Chevrolet Euro with a red pinstripe was too generic, and that was all the information Officer Garcia had at the time of the stop, other than that a black male was operating the vehicle. The court also found that the focus of the stop quickly switched from locating Phillips to Williams, and that a search of the vehicle had nothing to do with disorderly conduct that occurred four days ago. The court stated it was obvious to everyone that the officers were not going to release Williams once they determined he was not Phillips.

¶ 9. In reciting the testimony regarding the stop, the court observed that the sequence of events of identifying Williams, learning his driver's license was not valid, asking for consent to search his vehicle, and asking consent to search the trunk was not clear. However, the court did not make specific findings on these occurrences. The court indicated that it appeared Williams was asked to step out of the car so Officer Garcia could search it after she received the communication from Officer Fahrney. The court did not make any findings on why or when Williams was placed in the squad car.

¶ 10. The court stated it "had some real concerns with the consent to search," but decided it was not necessary to resolve those because of its conclusion that the initial stop was unlawful. The court did say that it did not "think the defendant was really given any alternatives in regard to his being released even after it was determined that he was not Demetrius Phillips."

## DISCUSSION

■

¶ 11. The State contends that the trial court erred in concluding that Officer Garcia did not have reasonable suspicion to make the initial stop. In addition, the State contends the undisputed evidence establishes that the officers' conduct after the initial stop was lawful, Williams consented to the search of his vehicle, he waived his *Miranda* rights, and his statement to Officer Fahrney was freely and voluntarily given. Williams contests each of these propositions.

■

¶ 12. We address first the issue of the lawfulness of the initial stop. In executing a valid investigative stop consistent with the Fourth Amendment prohibition against unreasonable searches and seizures, a law enforcement officer needs to reasonably suspect, in light of his or her experience, that some kind of criminal activity has taken or is taking place. *State v. Richardson*, 156 Wis. 2d 128, 139, 456 N.W.2d 830 (1990). Reasonable suspicion must be based on specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. *Id.* In determining what facts are sufficient to authorize police to stop a person, the court must take the totality of the circumstances into account. *Id.* The

essential question is whether the action of the law enforcement officer was reasonable under all the facts and circumstances present. *Id.* "It is a common sense inquiry, which strikes a balance between the interests of society in solving crime and the members of that society to be free from unreasonable intrusions.' " (Citations omitted.) *Id.*

¶ 13. In reviewing a trial court's order suppressing evidence, we uphold a trial court's findings of fact unless they are clearly erroneous. *State v. Mitchell*, 167 Wis. 2d 672, 428 N.W.2d 364, 368 (1992). Whether the facts as found by the trial court meet the constitutional standard is a question of law, which we review de novo. *State v. Krier*, 165 Wis. 2d 673, 676, 478 N.W.2d 63, 65 (Ct. App. 1991).

¶ 14. We conclude that Officer Garcia did have knowledge of facts sufficient to provide a reasonable suspicion that the driver of the vehicle had been involved in the domestic abuse incident. The vehicle she stopped was sufficiently similar to that described by the complainant, and a young black male was driving the vehicle. The fact that she saw the car within a few blocks of the scene of the domestic abuse incident was an additional relevant factor: it was reasonable to infer that Phillips frequented the neighborhood where his girlfriend lived. Finally, stopping the vehicle to determine if Phillips was the driver was a means to quickly find that out with minimal intrusion.

¶ 15. Williams contends that his car did not completely match the description of the suspect's vehicle because his car had four doors, not two, and did not have tinted windows, and therefore Officer Garcia should have known immediately it was not Phillips's car. Officer Garcia did testify Williams's car had four

doors, but her answer to the question whether she recalled the complainant telling her Phillips's car had two doors was "offhand no." Her testimony therefore does not establish that the complainant told her Phillips's car had two doors. As for the discrepancy over the windows, Officer Garcia could reasonably have concluded that the complainant witness may have made a mistake on this detail, given the match of the model and detail of the red pinstripe.

¶ 16. Williams also argues that Officer Garcia could see only that a young black male drove the car and that was insufficient to reasonably believe the driver matched the description of Phillips. However, what Officer Garcia observed of the driver, though very general, was consistent with the description of Phillips and that, together with the similarity of the car to the description of Phillips's car and the proximity to the scene of the domestic abuse, made it reasonable for Officer Garcia to stop the car to see if Phillips was the driver.

¶ 17. Williams also contends that the stop was unreasonable because four days had passed since the domestic abuse incident. While the proximity in time to the crime is a relevant factor in determining the constitutionality of an investigative detention of a suspect, there is no fixed requirement of how soon after the crime the stop must occur. *State v. Guzy*, 139 Wis. 2d 663, 677, 407 N.W.2d 548 (1987).[2] Given that this was a domestic abuse incident and Phillips was the boyfriend

[2] In *State v. Guzy*, 139 Wis. 2d 663, 667, 407 N.W.2d 548 (1987), the court considered whether the officers had reasonable suspicion to stop a vehicle they sighted one-half hour after a reported robbery in which the robber was described as "a white male, five feet five inches—five feet eight inches, dark

of the complainant, it was reasonable to suspect he would be in the area of the incident several days later.

shoulder-length hair and a beard, a slim build, wearing sunglasses and a blue vest with red stripes"; no description of a vehicle was given, nor was there an indication that more than one person was involved. The officers stopped a truck with Minnesota license plates heading toward Minnesota because the robber could have been in that area by that time, and the male occupants had unusually long hair. *Id.* The court concluded that these two factors, coupled with the fact that there were very few vehicles on the road at 2:30 a.m., justified the officers stopping the vehicle to see if one or the other occupant matched the description, in view of the circumstances that they had no other means of corroborating the physical description and might lose the opportunity to investigate once the vehicle crossed the border. In reaching this conclusion, the court cited with approval this list of factors, which, it said, are "helpful" and "must be considered in reaching the required determinations":

> (1) the particularity of the description of the offender or the vehicle in which he fled; (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3) the number of persons about in that area; (4) the known or probable direction of the offender's flight; (5) observed activity by the particular person stopped; and (6) knowledge or suspicion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation.

*Id.* at 677.

However, the court acknowledged that more was involved in a proper analysis than going through this list of factors:

> We agree that these factors are helpful and conclude that these factors must be considered in reaching the required determination. But the presence of some or all of these factors frequently does not end the problem for the law enforcement officers or the courts because questions remain. How many facts must be present in a given stop? What weight do we give these facts? When does the presence of one or more of these factors cross the line from being a "hunch" into being a "reasonable" suspicion? In

406

¶ 18. Having concluded that Officer Garcia had reasonable suspicion to stop Williams's vehicle to investigate whether the driver was Phillips, we next consider whether the conduct of the officers subsequent to the initial stop made the stop unlawful, as Williams contends. Williams asserts that, as soon as Officer Garcia saw the driver, she had to terminate the stop because she had seen a photograph of Phillips and would have known the driver was not Phillips. The State counters that Officer Garcia may not have been sure because Phillips's picture was two years old. However, Officer Garcia did not testify whether she recognized that the driver was not Phillips, and there is no evidence of Williams's appearance other than that he was a young black male. Thus, the parties are, in effect, disputing the proper inferences to draw from the evidence. However, that is the role of the trial court, not this court, and the trial court made no findings on this point. In any event, we conclude that, even if Officer Garcia realized that the driver was not Phillips before she asked his name and requested identification, it was reasonable for her to do this.

---

balancing the nature and quality of the intrusion on personal security against the importance of the societal interest, at what point does the scale tip to reasonably justify the stop even though there are insufficient facts to establish probable cause?

*Guzy* at 677.

In this case, the third and fourth factors are not relevant because the officer was not stopping a suspect who was fleeing from a crime that had just been committed, and there is no evidence pertaining to the fifth and sixth factors. We therefore focus in our analysis on the first and second factors, and others we have identified as relevant in this case.

¶ 19. In *State v. Ellenbecker*, 159 Wis. 2d 91, 464 N.W.2d 427 (Ct. App. 1990), we held that a request for a driver's license from a driver whose vehicle was disabled, and a status check on the license, did not transform a lawful "motorist assist" into an unlawful seizure. We noted first the reasons that a report by the officer and identification of the motorist may be necessary: the officer may be required to record citizen contact; the information may be helpful to the officer in the event of later citizen complaints against the officer; and the information may aid in an investigation of a crime, such as theft of a car, even though at the time the activity—refueling a disabled vehicle as in *Ellenbecker* —may be innocuous. *Id.* at 97, 464 N.W.2d at 430.

¶ 20. We next stated that WIS. STAT. § 343.18(1) (1999–2000)[3] gives law enforcement officers the authority to require a driver of a motor vehicle to display his or her license on demand. While we recognized that officers do not have unfettered discretion to stop drivers and request display of their licenses, we pointed out that Ellenbecker had not been signaled out for a spot check of his license, but was already stopped under lawful circumstance. We concluded that the request for Ellenbecker's license was reasonable. We also concluded that the check on the license's validity was reasonable because the authority to demand the license would be meaningless without that, and would not promote the purpose of § 343.18(1), which is to deter persons from driving without a valid license. *Ellenbecker*, 159 Wis. 2d at 97–98, 464 N.W.2d at 430. We held that the public

_____

[3] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

interest in requesting the license and running the check did not outweigh the very minimal intrusion on the driver. *Id.*

¶ 21. We recognize that *Ellenbecker* involved a motorist assist—where the vehicle was already stopped because it was disabled—while Williams was stopped to investigate whether he was the subject in a crime. However, we have already held that Williams was lawfully stopped. The issue here is therefore similar to that in *Ellenbecker*: whether the request for identification transforms that lawful stop into an unlawful seizure.

¶ 22. For the reasons we relied on in *Ellenbecker*, we conclude that it was reasonable for Officer Garcia to make a report of the incident, even if she had already decided that the driver was not Williams, and for that purpose it was reasonable for her to ask for Williams's name and identification. Once Williams stated that he had no identification, there was a reasonable ground for further detention. Under WIS. STAT. § 343.18(1), persons operating motor vehicles are required to have their licenses with them. The fact that Williams did not have identification was a violation of this statute and was a reasonable ground for suspecting that Williams was not authorized to drive. We conclude that Officer Garcia's calling Officer Henderson because he knew many people was a reasonable means of identifying Williams, and, further, that once she knew the man was Williams, it was reasonable for her to ask dispatch to determine whether he had a valid driver's license.[4]

---

[4] We observe that under *State v. Ellenbecker*, 159 Wis. 2d 91, 464 N.W.2d 427 (Ct. App. 1990), even if Williams had produced his driver's license, Garcia could have lawfully checked on the status of his license.

¶ 23. However, as the trial court pointed out, the sequence and timing of events from this point on is not clear from the testimony, and this hampers our analysis of the lawfulness of the stop after the point in time that Officer Garcia learned Williams did not have a valid driver's license. Once Officer Garcia knew Williams did not have a valid driver's license, she could at that point lawfully detain him further only for the purpose of giving him a citation for that violation, and, perhaps, for a violation of WIS. STAT. § 343.18(1), since the record discloses no basis for reasonably suspecting him of any other violation at that time.

¶ 24. It is true that when an officer has fulfilled the purpose of a lawful stop, the officer's request for permission to search the vehicle does not, in itself, transform the stop into an unlawful one. *State v. Gaulrapp*, 207 Wis. 2d 600, 558 N.W.2d 696 (Ct. App. 1996). In *Gaulrapp*, the person detained answered yes immediately, and we concluded that his consent was voluntary. *Id.* at 603, 608. Under those circumstances, we held the request to search did not unreasonably prolong the stop. *Id.* at 609.[5] However, in *State v. Gammons*, 2001 WI App 36, ¶ 24, 241 Wis. 2d 296, 308, 625 N.W.2d 623, we held that an officer acted unlawfully when he did not terminate the detention after the reason for the initial lawful stop was resolved, and the driver had answered no to the questions whether he had any drugs in the vehicle, and whether the officer

---

[5] A voluntary consent to search is one of the exceptions to the general rule that searches conducted without warrants violate the Fourth Amendment. *State v. Matejka*, 2001 WI 5, ¶ 17, 241 Wis. 2d 52, 621 N.W.2d 891 (2001).

could search the vehicle. In *Gammons*, upon being told the driver would not consent to a search, the officer said he would get a police dog to sniff the car, and if the dog indicated there were drugs in the car, he would search the vehicle; at that point the driver said the officer could search his vehicle. *Id.* at ¶ 3. We concluded that detaining the driver after he initially said no to the search transformed the stop into an unlawful detention, and the State could therefore not rely on the subsequent consent to search to justify the police actions. *Id.* at ¶ 24.

¶ 25. Accordingly, in order to determine whether a search of Williams's vehicle was lawful under *Gaulrapp*, we need to know the circumstances, including: (1) whether Officer Garcia asked Williams for consent to search his vehicle; (2) when she did so; (3) what he responded; and (4) when the search took place. We do not agree with the State that the answers to these questions are undisputed. Although Officer Garcia testified that she asked Williams for his consent and he gave it, there are reasonable inferences from Baumann's testimony, if it is believed, that may conflict with Officer Garcia's testimony: that Officer Garcia did not ask for Williams's consent, or she asked and he said no, or he objected initially and ultimately agreed. The State argues that it is unlikely Baumann heard the comment from Williams that she testified to because of Officer Fahrney's testimony about the distance, but that is a credibility issue for the trier of fact to resolve, not this court. The trial court's comments on its concerns about the consent to search suggest that the court did view the evidence as raising questions as to whether Williams gave consent and, if so, whether consent was voluntary. We conclude there is conflicting evidence on these points, which the trial court must resolve.

411

¶ 26. The State points out that even if Baumann's testimony is believed, she did not see the search, and what she did hear was very likely said after Williams consented to a search, after the search was carried out. We do not understand how this proposed timeline resolves the conflict in the testimony: the State does not explain why Williams would have made the comment Baumann testified to if he had already consented. The State may mean to suggest, as the prosecutor's questions to Baumann did, that the search could have occurred after Baumann heard Williams's objection, and he could have agreed after he made that objection. However, if the officers did not promptly ask for consent to search when they had completed the investigation on the driver's license status and promptly obtained a "yes," they could not lawfully detain Williams in order to attempt to obtain his consent through further discussion or persuasion. *See Gammons*, 241 Wis. 2d at ¶ 24. We also observe that it is not clear from the record, and the court made no findings, on why Williams was placed in the squad car before the search was conducted, if that is in fact what happened. There was no testimony that he was placed in the squad car in connection with preparing a citation regarding the driver's license violations.

¶ 27. We conclude we must remand to permit the trial court to make the factual findings necessary to determine whether the request to search unreasonably prolonged the stop, whether consent for the search was given, and, if so, was the stop unreasonably prolonged in order to obtain consent, and, if consent was given, whether it was involuntary. The trial court will then be able to decide whether the search of Williams's vehicle was lawful.

¶ 28. Williams contends, as he did before the trial court, that he was not properly advised of his *Miranda* rights and his statements to Officer Fahrney were not freely and voluntarily given. Part of Williams's argument on this issue is premised on his view of the evidence concerning consent to the search, and part requires findings of fact the court did not make because it suppressed the statements on the ground the initial stop was unlawful. On remand, the court will have the opportunity to make any findings of fact necessary to decide whether Williams's statements to Officer Fahrney must be suppressed.

*By the Court.*—Order reversed and cause remanded.